UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
:
In re:                                           :         CHAPTER 11
                                                 :
DEVAL CORPORATION,                               :
                                                 :         Case No. 16-17922 (AMC)
                                                 :
                Debtor.                          :
_____:

**OBJECTION OF DEVAL CORPORATION TO
THIRD AMENDED PLAN OF REORGANIZATION
PROPOSED BY PDI/DEVAL ACQUISITION, LLC**

DeVal Corporation, by and through its undersigned counsel, pursuant to 11 U.S.C. §§1128 and 1129 and Federal Rule of Bankruptcy Procedure 3020, hereby objects to the Third Amended Plan of Reorganization Proposed by the PDI/DeVal Acquisition, LLC (the "PDI/D Third Amended Plan"), and in support hereof, state as follows:

**Background**

1. On November 11, 2016 (the "Petition Date"), DeVal Corp. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. Since the Petition Date, the Debtor has been a debtor-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

3. PDI/D is an undersecured creditor in this case holding a junior second priority security interest in the Debtor's personalty and a second judgment lien on the Debtor's estate.

4. PDI/D's secured claim arises from its failed attempt to acquire the Debtor's business dating back to 2011.

5. Specifically, PDI/D provided certain financial management services and loaned

1

money for working capital to the Debtor pending its failed attempt to acquire the Debtor's business. It walked away from the acquisition of the Debtor's business leaving the company, and its Shareholders, with $135,000 unpaid trust fund taxes, scores of unpaid vendors and suppliers, and a lawsuit commenced by a former owner. PDI/D walked away from the turmoil it allowed to fester due to its own financial instability and the inability to consummate the deal.

6. In August 2016, PDI/D's attempts to execute upon a pre-petition judgment lien and security interests pledged in connection with the working capital loan directly led first to a reduction in its line of credit ("LOC") and then a complete freeze of its LOC causing a two-week shut down of business operations. Despite, the Debtor's principal's ability to restart the business, the PDI/D induced havoc took its toll on the remainder of 2016 and ultimately led to the Debtor's chapter 11 filing.

7. During the Debtor's Chapter 11 proceeding, PDI/D has attempted to leverage its junior secured claim to effectuate what amounts to a "second bite at the apple" in the form of a hostile takeover of the Debtor's business. PDI/D's attempted hostile takeover is embodied in a PDI/D's Third Amended Plan dated June 19, 2017 which purports to effectuate an acquisition of the Debtor's shares in exchange for a combination of the infusion of cash, the elimination of PDI/D's secured claim and credit support to fund payments to creditors.

8. PDI/D's competing plan impairs, but ultimately pays secured claims (other than its own claim) and priority claims in full and pays unsecured claims (other than subordinated claims) the aggregate amount of $250,000, representing a return of about 34%, plus a portion a potential litigation proceeds (if any such litigation is commenced).

9. The Debtor's Second Amended Plan dated June 16, 2017 (the "Debtor's Plan")

provides for the sale of the Debtor's assets to assignee of Parts Life ("NewCo") and the payment in full of all secured claims with interest, including the allowed claim of PDI/D, as well as the payment in full of priority claims. The Debtor's Plan provides for payments to general unsecured creditors (other than subordinated claims) totaling $260,000, representing about 36% of unsecured claims.

### Debtor's Objections to PDI/D's Third Amended Plan

10. *PDI/D Third Amended Plan is unconfirmable under section 1129(a) and 1129(b) of the Bankruptcy Code.* The PDI/D Third Amended Plan was rejected by classes 5, 6, 7 and 8 and thus cannot satisfy section 1129(a)(8) of the Bankruptcy Code. It fails to satisfy Section 1129(b) by virtue of the fact that the plan provides for PDI/D to acquire the Debtor's stock through an impermissible credit bid.

> Generally, a bankruptcy court may confirm a Chapter 11 plan only if each class of creditors affected by the plan consents. See § 1129(a)(8). Section 1129(b) creates an exception to that general rule, permitting confirmation of nonconsensual plans—commonly known as "cramdown" plans—if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1129(b)(2)(A) . . . establishes criteria for determining whether a cramdown plan is "fair and equitable" with respect to secured claims . . . ."

RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S.Ct. 2065, 2069 and 566 U.S. 639 (2012).

> A Chapter 11 plan confirmed over the objection of a "class of secured claims" must meet one of three requirements in order to be deemed "fair and equitable" with respect to the nonconsenting creditor's claim. The plan must provide:
>
> > "(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of

3

Document Page 4 of 9

such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

"(ii) for the sale, **subject to section 363(k) of this title,** of any **property that is subject to the liens securing such claims**, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

"(iii) for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A).

Under clause (i), the secured creditor retains **its lien on the property** and receives deferred cash payments. Under clause (ii), the property is sold free and clear of the lien, "subject to section 363(k)," and the creditor receives a lien on the proceeds of the sale. **Section 363(k), in turn, provides that "unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property"**—*i.e.,* **the creditor may credit-bid at the sale, up to the amount of its claim.** Finally, under clause (iii), the plan provides the secured creditor with the "indubitable equivalent" of its claim.

Radlax, 132 S.Ct. at 2069-70 (emphasis added).

The language of Code section 363(k) is simple and clear, as follows:

(k) At a sale under subsection (b) of this section **of property that is subject to a lien that secures an allowed claim**, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. 363(k). Subsection 363(k) does not apply to the PDI's Third Amended Plan in this case, because that plan does not propose to sell "property that is subject to a lien that secures an allowed claim" as expressly required by that subsection.

The Radlax court held that a debtor selling assets pursuant to a chapter 11 plan must allow a creditor *with a lien on the assets being sold* to credit bid on its collateral. However, that holding does not apply to PDI/D's Third Amend Plan, because PDI has no lien on the stock it

4

proposes to purchase. PDI/D does not propose to purchase the assets on which it holds a lien. A creditor with a lien on a Debtor's assets is not entitled to make a credit bid to purchase stock in the Debtor on which it holds no lien. In re Hickey Properties Ltd., 181 B.R. 171, 172-173 (Bankr. D. Vt. 1995); In re Bjolmes Realty Trust, 134 B.R. 1000 at FN 22 (Bankr. D.Mass. 1991). Queenan, Standards for Valuation of Security Interests in Chapter 11, 92. Com.L.J. 18, 58-59 (1987).

This result is clear from the express language of subsection 363(k), as well as the following legislative history of Code section 363.

> At a sale free and clear of other interests, any holder of any interest in the property being sold will be permitted to bid. If that holder is the high bidder, he will be permitted to offset the value of his interest against the purchase price of the property. **Thus, in the most common situation, a <u>holder of a lien on property being sold</u> may bid at the sale, and if successful, may offset the amount owed to him that is secured <u>by the lien on the property (but may not offset other amounts owed to him)</u> against the purchase price, and be liable to the trustee for the balance of the sale price, if any.**"

H. Rep. No. 595, 95th Cong., 1st Sess. 345–46 (1977).

> Under subsections (d) and (e), the use, sale, or lease of property is further limited by the concept of adequate protection. Sale, use, or lease of property in which an entity other than the estate has an interest may be effected only to the extent not inconsistent with any relief from the stay granted to that interest's holder. Moreover, the court may prohibit or condition the use, sale, or lease as is necessary to provide adequate protection of that interest. Again, the trustee has the burden of proof on the issue of adequate protection. **Subsection (e) also provides that where a sale of the property is proposed, an entity that has an interest in such property may bid at the sale thereof and set off against the purchase price up to the amount of such entity's claim.** No prior valuation under section 506(a) would limit this bidding right, since the bid at the sale would be determinative of value.

S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978) (note that the provision was in subsection (e) of the Senate amendment).

The PDI/D Third Amended Plan therefore cannot be confirmed, because PDI seeks to make payment for the purchase by an impermissible credit bid.

11. *PDI/D's Third Amended Plan violates 11 U.S.C. §1129(a)(11) because it is not feasible and is likely to be followed by liquidation or the need for further financial reorganization.* Section 1129(a)(11) required that a plan be feasible in order to be confirmed. Specifically, it requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan…" 11 U.S.C. §1129(a)(11).

PDI/D is no stranger to the management, employees and vendors of the Debtor. PDI/D's failed attempt to acquire the Debtor, and the damage it wreaked by its collection actions in 2016 left a lasting impression on all involved. If successful, PDI/D's hostile takeover of the Debtor will *ultimately* leave the Debtor's business operations and its relationship with vendors and customers burdened and depleted by the departures of the Debtor's principals, as well as all management and administrative staff after, and only after, these dedicated principals and employees fulfill their fiduciary duties through the transition to a closing. While PDI/D did provide certain financial management services to the Debtor pending its failed attempt to acquire the Debtor's business, it never operated, nor understood, the Debtor's niche/specialized market or business. PDI/D's likelihood of success in operating the Debtor's business without the knowledge, contacts and experience of the Debtor's principals, the plant manager, the director of procurement, the director of contracts, the shop manager, the director of IT, the controller, the HR director and other key administrative staff is little to none. A PDI/D hostile takeover is destined for failure whether they pay unsecured creditors 34% of claims or a 100% of claims.

12. *11 U.S.C. §1129(c) dictates the confirmation of the Debtor's Plan over PDI/D's Third Amended Plan.* Section 1129(c) provides that "the court may confirm only one plan….and [i]f the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. §1129(c). It goes without saying that the Debtor's equity shareholders/principals prefer the Debtor's Plan over the PDI/D Plan. They have seen the ineffectiveness of PDI/D's management of the Debtor's business and would not voluntarily expose their employees, vendor and customers to a repeat performance. The Debtor's equity shareholders have worked tirelessly to maximize the value and operations of the Debtor's business during this Chapter 11 proceeding, and firmly believe that the best interests of all constituencies lie in a sale of assets to NewCo. However, the Court need not rely on solely upon the shareholders' preferences; it simply needs look to the votes of creditors. PDI/D's Third Amended Plan garnered 22 Class 6 General Unsecured Creditor votes. 17 of those 22 votes or 77% voted to reject PDI/D's Third Amended Plan. In dollar/claim amounts, 94% of Class 6 General Unsecured Creditors voted to reject PDI/D's Third Amended Plan. In sharp contrast, the Debtor's Plan garnered 24 Class 6 General Unsecured Creditor votes. 22 of those 24 votes or 92% voted to accept the Debtor's Plan. In dollar/claim amounts, 99% of Class 6 General Unsecured Creditors voted to accept the Debtor's Plan. To borrow a popular reality show catch phrase: "the tribe has spoken." Creditors overwhelmingly support the Debtor's Plan for the continuity it will bring them, the long-term prospects of doing business with NewCo and the distasteful memory of PDI/D's prior treatment of the creditor body. Even if PDI/D is permitted to amend its plan at the eleventh hour in an attempt to "snatch victory from the jaws of defeat"

with an upgraded 100% payout of Class 6 Unsecured Claims, the Debtor firmly believes that many creditors would still prefer its plan. The short-sighted benefit of a larger initial pay out does not outweigh the long-term benefits of a mutually business relationship with a business with real prospects to not only survive, but thrive. Class 6 Unsecured Creditors deserve that right to choose.

13. *PDI/D's Third Amended Plan violates 11 U.S.C. §1129(a)(3) as it was not filed in good faith.* PDI/D learned that Parts Life was going to obtain its financing commitment letter and worried that the overwhelming creditor support of the Debtor's Plan doomed its chances for victory, its counsel announced in open court PDI/D's intention to file an amended plan which increase the recovery to unsecured creditors from 34% to 100% (over time), but *only* "if Parts Life receives an effective and unconditional lending commitment prior to the confirmation hearing." PDI/D's threatened last minute gamesmanship perverts the plan process and public confidence in the bankruptcy system. From a public policy posture, allowing a losing bidder to effectively up its bid after the sale effectively lowers bids and allows the obviously low ball tactics displayed by PDI/D. If PDI/D had the wherewithal and desire to pay creditors 100%, they should have made that offer before the risk of loss evident. These sharp tactics should not be condoned for the potential upside to creditors in the instant case to the assault of the integrity of the bankruptcy process going forward.

**WHEREFORE**, the Debtor respectfully requests that this Honorable Court deny confirmation of PDI/D's Third Amended Plan and confirms the Debtor's Pan.

Respectfully Submitted,

**SMITH KANE HOLMAN, LLC**

Dated: July 28, 2017         **By:** */s/ Robert M. Greenbaum*
                                  Robert M. Greenbaum, Esquire
                                  112 Moores Road
                                  Suite 300
                                  Malvern, PA  19355
                                  (610) 407-7216 Telephone
                                  Attorney for DeVal Corp.