# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re:<br><br>DeVal Corporation<br><br>　　　　　Debtor | Case No.: 16-17922 (AMC)<br>Chapter 11 |

## Stipulation of Facts

Parts Life, Inc. (PL) and PDI DeVal Acquisition LLC ("PDI"), through counsel, hereby stipulate to the following facts (without conceding their relevance) for purposes of the hearing on PDI's pending Motion for Entry of an Order Allowing Administrative Expense Pursuant to Sections 503(b)(3)(D) and 503(b)(4) ("Motion").

1. At his deposition on February 9, 2018, DeVal's principal, Irwin Haber testified that PDI was interested in acquiring Deval Corporation ("Deval"), so Irwin Haber initiated a meeting with Dominick Durinzi to discuss his interest in selling.

2. Irwin Haber testified that Dominic Durinzi did not want to even begin a discussion with Irwin Haber about selling the company until he obtained an assurance that PDI intended to maintain the company's operations in Philadelphia.

3. Deval and PDI Deval Acquisition LLC ("PDI") entered into an Asset Purchase Agreement dated November 4, 2010 providing for PDI to acquire substantially all the assets of Deval; closing was scheduled for December 15, 2010. The parties never closed on that Agreement, due primarily to PDI's inability to obtain the necessary financing.

4. PDI and Deval entered into a Management Agreement dated February 8, 2011 ("Management Agreement"), which provided for PDI to manage Deval's business pending a closing on the Asset Purchase Agreement.

5. During the agreed term of the Management Agreement, Deval made no significant payments to third parties without the approval of Irwin Haber.

6. During the agreed term of the Management Agreement PDI advanced $2,011,861.12 to Deval for operating expenses. Deval repaid $1,391,500 of that amount. Leaving a balance of approximately $620,000.

7. From that time until the closing on DeVal's sale of assets to Parts Life DeVal made no payments of principal or interest to PDI on account of the outstanding balance.

8. After a trial in Ohio state court, a judgment was entered in favor of PDI and against DeVal in the amount of $982,933.36, plus continuing interest at 18% per annum.

1

9. PDI domesticated its money judgment in Pennsylvania. It knew that a possible outcome of doing that was that Deval would be a debtor in a chapter 7 bankruptcy case in which PDI (and therefore unsecured creditors) would receive no payment at all. It could have prevented that risk by not proceeding with the domestication of the judgment, but it did domesticate the judgment.

10. When PDI proceeded with execution on its domesticated money judgment in Pennsylvania it knew that doing so could result in BB&T Bank freezing Deval's borrowings, sweeping Deval's cash, and failing to honor Deval's payroll checks, and those results did follow after PDI executed on its money judgment in Pennsylvania.

11. After PDI arranged for service of a writ of execution on BB&T Bank, Irwin Haber prepared an internal memorandum dated August 17, 2016 noting that its actions could result in Deval filing a Chapter 11 case, which would probably not be a good outcome for Dominic Durinzi, Ron Penska, or Deval. That memo further states that PDI would prefer to proceed in a different way because that would be more advantageous to Durinzi and Penska; the memo makes no reference to the best interests of unsecured creditors.

12. When PDI proceeded with execution on its judgment in Pennsylvania, Irwin Haber understood that such execution would grant PDI certain lien rights which could be lost/avoided as a preference if Deval filed a bankruptcy case within 90 days after such lien was created, and he monitored the running of that 90 day period. Irwin Haber believed that more of Deval's assets would secure PDI's claim if Deval filed a bankruptcy case more than 90 days after the lien was created, than would be the case if the bankruptcy case was filed within 90 days after the lien was created.

13. PDI retained the Dilworth Paxson law firm to represent it in connection with the pursuit of collection from Deval and related entities and in connection with the possible acquisition of DeVal's assets.

14. By letter dated September 2, 2016 PDI forwarded to Deval a two page term sheet proposing that PDI acquire all of Deval's personal property through a sale conducted pursuant to Bankruptcy Code section 363, for a purchase price of $750,000, subject to higher bids; at that time PDI understood that if the proposed transaction closed, no payment would be made to Deval's general unsecured creditors.

15. A subsequent revised/blacklined Term Sheet delivered to DeVal's counsel in January 2017 proposed that PDI acquire Deval's personal property in consideration of a payment of $675,000 to BB&T Bank, $25,000 in cash to Deval, and forgiveness of the PDI debt, subject to higher bids. Irwin Haber testified that, if that proposed transaction had closed, no payment would have been made to Deval's general unsecured creditors.

16. Irwin Haber testified that PDI's primary purpose in proposing the transactions described in the term sheets was to collect the amount that it was owed by Deval; at that time Irwin Haber believed that acquiring the business was the only way PDI would realize any recovery on the debt.

17. Deval Corporation filed its bankruptcy case on November 11, 2016. Page 5.

2

120273258_3

18. At all times during the bankruptcy case, DeVal acknowledged that its only viable course of action was to sell its business as a going concern.

19. The first pleading filed by PDI in the bankruptcy case seeking substantive relief was filed on March 17, 2017, when PDI filed an objection to DeVal's motion to extend the plan exclusivity period and use cash collateral and a cross-motion to appoint a trustee.

20. On March 31, 2017, after the Bankruptcy Court overruled DeVal's objection to PDI's document request in connection with the depositions of Messrs. Durinzi and Peska, DeVal produced the documents in Exhibit A hereto, in response to PDI's request for "All agreements, term sheets, memoranda of understanding, or other documents reflecting any agreements or potential agreements with any party who, at this time, remains a viable potential purchaser of or lender to the Debtor's business".

21. PDI withdrew its March 2017 motion for appointment of a trustee after the court heard testimony but before the court issued a ruling on that motion.

22. PDI subsequently filed a second motion seeking appointment of a trustee if the Debtor did not engage a chief restructuring officer (CRO), and settled that motion by an agreement with the Debtor for appointment of a CRO. Irwin Haber testified that PDI took those actions because it wanted to ensure the integrity of the debtor's reporting of information and make sure that the debtor was "playing honestly or fairly." Irwin Haber testified that the CRO did not advise PDI of any information of great concern of which PDI was previously unaware.

23. Irwin Haber testified that PDI's primary purpose in the bankruptcy case from the very first day was to have the Debtor company sold through the bankruptcy process. Irwin Haber also testified that PDI's primary purpose in seeking to have the company sold was to acquire the company itself, or have its claim paid in full from a sale to a third party.

24. PDI's first preference was to recover its investment by acquiring Deval. Irwin Haber did not recall any time during the bankruptcy case at which he would have preferred to have been paid cash on account of PDI's claim rather than acquiring the company. He never told Dominic Durinzi or anyone else at Deval that he would prefer to receive cash rather than acquiring the company.

25. By an e-mail dated July 26, 2017 to the attorneys for Deval and Parts Life Inc. (and others) PDI's attorney advised that PDI intended to increase the amount it proposed to pay to general unsecured creditors under his plan if Parts Life was successful in obtaining a loan commitment letter with no substantial unsatisfied conditions to closing other than confirmation of the debtor's plan that was reliably likely to result in a timely effective date of closing.

26. Irwin Haber testified that, if Parts Life did not obtain such a commitment letter, PDI did not intend to increase its offer to general unsecured creditors.

27. Irwin Haber testified that PDI increased its initial offer and subsequent offers to purchase Deval in response to offers made by Parts Life, in order for PDI to acquire DeVal.

28. Irwin Haber testified that PDI's primary purpose in analyzing whether to proceed

3

with an asset versus a stock acquisition was to determine which alternative gave PDI the best likelihood of acquiring Deval.

29. PDI obtained a court order approving its Disclosure Statement, and served that Statement together with a proposed Chapter 11 plan on parties in interest. The first PDI plan served on creditors provided for payment to Wells Fargo over time, with interest. PDI had the ability to pay the Wells Fargo claim in full on the plan effective date, but propose to pay the claim over time because that treatment was more advantageous to PDI. Wells Fargo filed a ballot rejecting that plan. PDI then amended his plan to provide for payment in full to Wells Fargo on the plan effective date.

30. PDI executed a confidentiality agreement with Deval dated June 9, 2017. Prior to that date PDI had not signed any confidentiality agreement with Deval.

31. Deval was more valuable to PDI if it was a going concern than if it terminated operations.

32. The continued operation of Deval was a benefit to Deval's general unsecured creditors.

33. Irwin Haber testified that PDI advised the Bankruptcy Court that it objected to the customer deposits being made by Parts Life to Deval.

34. Irwin Haber testified that neither Irwin Haber nor any other representative of PDI ever contacted any of the general unsecured creditors in connection with the Deval bankruptcy case.

35. At the outset of Deval's bankruptcy case, PDI did not expect that its legal fees incurred in the case would be reimbursed by the bankruptcy estate.

36. PDI's CFO prepared a document captioned sources and uses of cash for Parts Life-Deval as of June 16, 2017. That document includes an estimate of the amount to be paid on account of PDI's section 503(b) substantial contribution claim, in the amount of $60,000.

37. After June 16, 2017 PDI incurred legal fees in the amount of $64,940.76 and expenses in the amount of $4,071.76 in connection with the Deval bankruptcy case.

| Subranni Zauber LLC<br>Attorneys for Parts Life Inc.<br><br><br>_____/s/_____<br>By: John P. Leon, Esq. JL4638<br>Willow Ridge Executive Office Park<br>750 Route 73 South, Suite 307B<br>Marlton, NJ 0805<br>(609) 347-7000; Fax: (609) 345-4545 | Dilworth Paxson LLP<br>Attorneys for PDI Deval Acquisition LLC<br><br>_____/s/_____<br>By: James M. Matour<br>1500 Market Street, Suite 3500E<br>Philadelphia, PA  19102<br>Tel: (215) 575-7134 Fax: (215) 575-7200 |
|---|---|