# **EXHIBIT A**

[Stipulation of Facts]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>DeVal Corporation,<br><br>                        Debtor. | Chapter 11<br><br>Case No. 16-17922 (AMC) |

### NOTICE OF DEPOSITION OF DOMINIC J. DURINZI

To:   Mr. Dominic J. Durinzi, President
      Deval Corporation
      7341 Tulip Street
      Philadelphia, PA  19136

**PLEASE TAKE NOTICE**, that counsel for creditor and party-in-interest, PDI/DeVal

Acquisition, LLC ("PDI"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure

and Rule 2004-1 of the Local Rules of the United States Bankruptcy Court of the Eastern District

of Pennsylvania, will take the oral deposition of Dominic J. Durinzi, President of DeVal

Corporation (the "Debtor") at the offices of Dilworth Paxson LLP, 1500 Market Street, Suite

3500E, Philadelphia, PA 19102 on, Thursday, March 23, 2017 beginning at 10:00 a.m.  The

deposition will be taken by a notary public, court reporter, or other authorized person and will

continue until completed.

     The deponent is to bring with him all documents in his possession, custody, or control the

described on the attached Exhibit "A".

Dated: March 20, 2017              By: /s/ James M. Matour
                                 James M. Matour
                                **DILWORTH PAXSON LLP**
                                1500 Market Street, Suite 3500E
                                Philadelphia, Pennsylvania 19102
                                (215) 575-77134
                                (215) 575-7200  (fax)
                                *Counsel PDI/DeVal Acquisition, LLC*

## EXHIBIT A

1.  All correspondence (also including emails) with DCMA, DLA or other government agencies relating to the Debtor's contracts for the production of component parts of the Navy's MHU-191 transporters (MHU-191 Contracts"), sent or received since the Petition Date, November 11, 2016.

2. All releases under the MHU-191 Contracts.

3.  All correspondence (also including emails) relating to the cancellation, potential cancellation or status of contracts other than the MHU-191 Contracts.

4.  The Debtor's two most recent Inventory Breakdown Reoprts.

5.  All agreements, term sheets, memoranda of understanding, or other documents reflecting any agreements or potential agreements with any party who, at this time, remains a viable potential purchaser of or lender to the Debtor's business.

6.  The most current accounts receivable aging.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>DeVal Corporation,<br><br>                         Debtor. | Chapter 11<br><br>Case No. 16-17922 (AMC) |

## NOTICE OF SERVICE

**PLEASE TAKE NOTICE** that on March 20, 2017, creditor and party-in-interest PDI Deval Acquisition, LLC, by its undersigned counsel, served the (i) Notice of Deposition of Dominic J. Durinzi and (ii) this Notice of Service upon counsel for the Debtor via electronic mail and first-class mail as follows:

| **ROBERT M. GREENBAUM**<br>Smith Kane<br>112 Moores Road, Suite 300<br>Malvern, PA 19355<br>rgreenbaum@sgllclaw.com | **DAVID B. SMITH**<br>Smith Kane<br>112 Moores Road, Suite 300<br>Malvern, PA 19355<br>dsmith@smithkanelaw.com |
|---|---|

Dated:  March 20, 2017

By: /s/ James M. Matour
James M. Matour
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, Pennsylvania 19102
(215) 575-77134
(215) 575-7200  (fax)

*Counsel for Creditor and Party-in-Interest*
*PDI/DeVal Acquisition, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>DeVal Corporation,<br><br>                Debtor. | Chapter 11<br><br>Case No. 16-17922 (AMC) |

## <u>NOTICE OF DEPOSITION OF RONALD E. PENSKA</u>

To:   Ronald E. Penska, Vice President
       Deval Corporation
       7341 Tulip Street
       Philadelphia, PA 19136

**PLEASE TAKE NOTICE**, that counsel for creditor and party-in-interest, PDI/DeVal

Acquisition, LLC ("PDI"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure

and Rule 2004-1 of the Local Rules of the United States Bankruptcy Court of the Eastern District

of Pennsylvania, will take the oral deposition of Ronald E. Penska, Vice President of DeVal

Corporation (the "Debtor") at the offices of Dilworth Paxson LLP, 1500 Market Street, Suite

3500E, Philadelphia, PA 19102 on, Thursday, March 23, 2017 beginning at 10:00 a.m. The

deposition will be taken by a notary public, court reporter, or other authorized person and will

continue until completed.

The deponent is to bring with him all documents in his possession, custody, or control

described on the attached Exhibit "A".

Dated: March 20, 2017

                                   By: /s/ James M. Matour
                                   James M. Matour
                                   **DILWORTH PAXSON LLP**
                                   1500 Market Street, Suite 3500E
                                   Philadelphia, Pennsylvania 19102
                                   (215) 575-77134
                                   (215) 575-7200  (fax)
                                   *Counsel for PDI/DeVal Acquisition, LLC*

# EXHIBIT A

1.  All correspondence (also including emails) with DCMA, DLA or other government agencies relating to the Debtor's contracts for the production of component parts of the Navy's MHU-191 transporters (MHU-191 Contracts"), sent or received since the Petition Date, November 11, 2016.

2. All releases under the MHU-191 Contracts.

3.  All correspondence (also including emails) relating to the cancellation, potential cancellation or status of contracts other than the MHU-191 Contracts.

4.  The Debtor's two most recent Inventory Breakdown Reoprts.

5.  All agreements, term sheets, memoranda of understanding, or other documents reflecting  any agreements or potential agreements with any party who, at this time, remains a viable potential purchaser of or lender to the Debtor's business.

6.  The most current accounts receivable aging.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>DeVal Corporation,<br><br>             Debtor. | Chapter 11<br><br>Case No. 16-17922 (AMC) |

### NOTICE OF SERVICE

**PLEASE TAKE NOTICE** that on March 20, 2017, creditor and party-in-interest PDI

Deval Acquisition, LLC, by its undersigned counsel, served the (i) Notice of Deposition of

Ronald E. Penska and (ii) this Notice of Service upon counsel for the Debtor via electronic mail

and first-class mail as follows:

| **ROBERT M. GREENBAUM**<br>Smith Kane<br>112 Moores Road, Suite 300<br>Malvern, PA 19355<br>rgreenbaum@sgllclaw.com | **DAVID B. SMITH**<br>Smith Kane<br>112 Moores Road, Suite 300<br>Malvern, PA 19355<br>dsmith@smithkanelaw.com |
|---|---|

Dated: March 20, 2017

By: /s/ James M. Matour
James M. Matour
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, Pennsylvania 19102
(215) 575-77134
(215) 575-7200 (fax)

*Counsel for Creditor and Party-in-Interest*
*PDI/DeVal Acquisition, LLC*

## Matour, James M.

| | |
|---|---|
| **Subject:** | DeVal Corp. re: re: Supplemental Production of Documents in connection with Notice of Depositions (Request No. 5) |
| **Attachments:** | rmg letter to j. matour.3.31.17.pdf; Document Production.DEV 0220 to DEV 0281.pdf |

Jim-

As ordered by the Court, see attached for a supplemental production of documents per PDI's Notices of Deposition, together with my transmittal letter of today's date re: Request for Production No. 5.

These documents are numbered DEV-0220 through DEV-0281.

Rob
https://amgreatness.com/2018/07/23/just-how-far-will-the-left-go/

Robert M. Greenbaum, Esquire
SMITH KANE HOLMAN, LLC
112 Moores Road
Suite 300
Malvern, PA 19355
(610) 407-7216 phone
(610) 407-7218 fax
rgreenbaum@skhlaw.com
www.skhlaw.com

www.DilworthLaw.com

This E-Mail is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you have received this communication in error, please do not distribute it and notify us immediately by email: postmaster@dilworthlaw.com or via telephone: 215-575-7000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

# SMITH KANE HOLMAN

### A Limited Liability Company

112 MOORES ROAD, SUITE 300
MALVERN, PENNSYLVANIA 19355

ROBERT M. GREENBAUM

DIRECT DIAL: (610) 407-7216
E-MAIL: RGREENBAUM@ SKHLAW.COM

ONE LIBERTY PLACE; 36TH FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103
TEL: (215) 496-1910
FAX: (215) 496-1915

TEL: (610) 407-7215
FAX: (610) 407-7218

www.skhlaw.com

March 31, 2017

**VIA E-Mail**
James M. Matour, Esquire
Dilworth Paxon, LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102

Re:   In re DeVal Corporation
      **United States Bankruptcy Court for the Eastern District of Pennsylvania;
      Case No. 16-17922**

Dear Jim:

Enclosed please find a production of documents responsive to your recent request for certain documents in connection with the Notices of Deposition of Dominic Durinzi and Ronald Penska re: Requests for Production Nos. 5. These documents are numbered DEV-0220 through DEV-0281.

Please feel free to contact me directly with any questions or concerns regarding the above.

Very truly yours,

SMITH KANE HOLMAN, LLC

ROBERT M. GREENBAUM

RMG:rh
Enclosures



DIRECT DIAL NUMBER:
215-575-7134

JAMES M. MATOUR
jmatour@dilworthlaw.com

March 13, 2017

VIA USPS and Email
dsmith@skhlaw.com

David B. Smith , Esquire
Smith Kane Holman LLC
112 Moores Road, Suite 300
Malvern, PA 19355

RE: DeVal Corporation

Dear David:

Following up my voice message, I advise you of the following. on behalf of PDI/DeVal Acquisition, LLC ("PDI/D"):

PDI/D's $1 Million investment in the Debtor – as well as the interests of other creditors, vendors and employees - is being destroyed by the Debtor's inaction. Meanwhile, the shareholders continue to collect an unjustifiably high level of compensation. PDI/D will passively tolerate this state of affairs no longer.

PDI/D's offer to proceed with the transactions described in our February 16 Term Sheet, which had been twice revised to accommodate your clients' issues, is hereby withdrawn.

PDI/D intends to proceed with an expedited motion for the appointment of a Chapter 11 Trustee or, in the alternative, the termination of exclusivity. A proposed Plan will be attached. The filing will be made as soon as the papers are complete, and no later than Wednesday, March 15, 2017. The grounds will include, among other things, the Debtor's administrative insolvency, continuing losses to the Bankruptcy Estate, and the mismanagement of the Debtor in failing to make any progress toward a sale or reorganization - despite having been presented with the means to do so.

We intend to seek an expedited hearing on the Trustee Motion on Monday, March 27, or the first available time thereafter as the Court's calendar permits. In accordance with Local Rule 5070-1 , please advise whether you consent.

1500 Market Street • Suite 3500E • Philadelphia, PA 19102-2101 • 2155757000 • fax: 215-575-7200
www.dilworthlaw.com • Cherry Hill, NJ • Harrisburg, PA • Red Bank, NJ • Wilmington, DE
C:\Users\definjma\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\9NKRGFGW\Smith Kane Holman letter
03_13_17.DOCX

DEV-0220

Mr. David Smith
March 13, 2017
Page 2

In connection with the Trustee Motion, PDI/D will depose Messrs. Durinzi, Penska and Sickinger. I will provide formal notices of deposition upon filing the Motion, but wanted to give as much advance actual notice as possible. I desire to depose them between Monday, March 20 and Wednesday, March 22.

PDI/D will consider refraining from filing its Trustee Motion if, and only if, you confirm to me, in writing, prior to the filing and in any event by Noon on Wednesday, March 15, 2017, each of the five (5) items below. Meanwhile, I have advised my client to refrain from direct communication with the Debtor:

1. The Debtor and Messrs. Durinzi and Penska have agreed to the terms of the Term Sheet with (a) an appropriately adjusted timeline and (b) one additional change: That Mr. Durinzi will be employed by PDI/D, but only at will and without a contract (or any restrictive covenants), at the initial rate of compensation set forth in the Term Sheet, with any bonus to be reduced pro rata in the event his employment terminates for any reason prior to the first anniversary of closing;

2. That you have requested a meeting with BB&T (counsel and a responsible officer) at BB&T's earliest convenience, with the meeting to occur by March 22, 2017;

3. That you have confirmed the scheduling of a meeting among the Debtor, PDI/D and DCMA at DCMA's earliest availability (ideally on or about March 22, 2017). The meeting would be attended by the administrative contract officer and other appropriate personnel at DCMA Philadelphia;

4. That PDI/D will immediately be afforded full access to the Debtor's personnel and books and records to perform due diligence, including an in person visit by PDI/D's CFO; and

5. That you expect to be ready to file expedited DIP Financing and Sale Motions by March 27, 2017.

The foregoing conditions are not negotiable.

Unless and until I receive your timely advice to the contrary, I will assume that these conditions will not be accepted and will continue to finalize the Trustee Motion and Plan.

Very truly yours,

James M. Matour

JMM/mad

C:\Users\definium\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\9NKRGFGW\Smith Kane Holman letter 03_13_17.DOCX

DEV-0221

Subj:       **Roderick**
Date:       3/16/2017 2:50:51 P.M. Eastern Daylight Time
From:       gene@linkmeyerlaw.com
To:         hystick93@aol.com, dominicdj@msn.com

Dom/Ron—

As you can see below, Roderick is interested on a granular level.  He is trying to understand what his sales pitch can be to his potential funders.

Do you want to spend the time answering these questions? or do you just want to get an NDA from him and then allow him to do his own due diligence?  Might save you two time.

Let me know.

Best,

Gene M. Linkmeyer, Esq.
610-348-6899
Gene@LinkmeyerLaw.com | www.LinkmeyerLaw.com



*The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individuals or entities named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and purge this communication immediately without making any copy or distribution. To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter[s]. To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.*

Begin forwarded message:

**From:** "Roderik" <ralewijnse@gmail.com>
**Subject: RE: Two businesses**
**Date:** March 15, 2017 at 12:12:55 PM EDT
**To:** "'Gene Linkmeyer'" <gene@linkmeyerlaw.com>

Gene,

I have a few questions on the financials:

- What is the investment in DACVAL LLC? Is there any income form this? Who owns the other 51%? What would happen with this asset in a sale?
- There are expenses labeled "pension". Is there a pension scheme or are these 401(k) expenses? If these is a pension scheme, is the company liable for anything?
- There is an expense labeled "rent office buildings". Why does the amount change over the years? Who is the owner of the office buildins? What will this amount be in 2017 and following years?
- There is an expense labeled "professional services" with large amounts. Is this related to legal expenses on the lawsuits? How much of it was extraordinary in 2016? (226k and 202k were extraordinary in 2014 and 2015). What would a normal amount be for legal expenses?
- Were there other extraordinary expenses in 2016?
- Materials expenses are historically about 29% of sales. Will this continue to be the same in

the next years?

- Direct labor expenses are historically about 12% of sale. Will this continue to be the same in the next years?
- Office salaries were reduced by $67k between 2015 and 2016. Were people terminated? What functions were eliminated? Can the company continue without re-hiring the next 2 years?
- Officer salaries (I assume Ron and Dom) were $457k in 2016. What is their expectation for their compensation for 2017 and 2018?
- Prepayments (on the balance sheet) were reduced from $119k end of 2015 to $34k end of 2016. What is the reason and does it have to be increased again in 2017?
- What were "progress payments" for on the balance sheet?

Best,

*Roderik Alewijnse*
M +1.484.802.0909

**From:** Gene Linkmeyer [mailto:gene@linkmeyerlaw.com]
**Sent:** Tuesday, March 07, 2017 1:13 PM
**To:** Roderik <ralewijnse@gmail.com>
**Subject:** Re: Two businesses

I have set a 10am Thursday walk through for us at the plant—7341 Tulip Street Phila., PA 19136

I can meet you there.  If you need/want earlier or later please let me know and we can adjust.

Best,

Gene M. Linkmeyer, Esq.
610-348-6899
Gene@LinkmeyerLaw.com  |  www.LinkmeyerLaw.com



LINKMEYER
LAW GROUP

*The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individuals or entities named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and purge this communication immediately without making any copy or distribution. To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter(s). To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.*

Friday, March 31, 2017 AOL: HYSTICK93

DEV-0223

On Mar 7, 2017, at 11:37 AM, Roderik <ralewijnse@gmail.com> wrote:

Noon?

*Roderik Alewijnse*
M +1.484.802.0909

**From:** Gene Linkmeyer [mailto:gene@linkmeyerlaw.com]
**Sent:** Monday, March 06, 2017 5:00 PM
**To:** Roderik <ralewijnse@gmail.com>
**Subject:** Re: Two businesses

Yes, if before 4pm.  When is good for you?  Let me know if you want to visit
the business location.

Gene M. Linkmeyer, Esq.
610-348-6899
Gene@Linkmeyerlaw.com  |  www.Linkmeyerlaw.com

<image001.png>
*The information contained in this electronic message may be legally privileged and confidential
under applicable law, and is intended only for the use of the individuals or entities named above. If the
recipient of this message is not the above-named intended recipient, you are hereby notified that any
dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this
communication in error, please notify the sender and purge this communication immediately
without making any copy or distribution. To ensure compliance with the requirements imposed by the IRS,
we inform you that any U.S. federal tax advice contained in this communication (including the
attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the
Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or
tax-related matter[s]. To provide you with a communication that could be used to avoid penalties under
the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our
part.*

On Mar 6, 2017, at 4:52 PM, Roderik <ralewijnse@gmail.com>
wrote:

Interesting.

Do you have time to talk tomorrow?

*Roderik Alewijnse*
M +1.484.802.0909

**From:** Gene Linkmeyer [mailto:gene@linkmeyerlaw.com]
**Sent:** Monday, March 06, 2017 4:40 PM
**To:** Roderik <ralewijnse@gmail.com>
**Subject:** Re: Two businesses

Updated financial snap shot.

Subj:     **Fwd: Deval Corp**
Date:     3/29/2017 3:10:42 P.M. Eastern Daylight Time
From:     <u>gene@linkmeyerlaw.com</u>
To:       <u>dominicdj@msn.com</u>
CC:       <u>hystick93@aol.com</u>

FYI see below as approved by Roderick.  Hope this helps.

Gene M. Linkmeyer, Esq.
610-348-6899
<u>Gene@LinkmeyerLaw.com</u>  |  <u>www.LinkmeyerLaw.com</u>  | @BizDivPA



*The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individuals or entities named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and purge this communication immediately without making any copy or distribution. To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter[s]. To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.*

Begin forwarded message:

**From:** "Roderik" <<u>ralewijnse@gmail.com</u>>
**Subject: RE: Deval Corp**
**Date:** March 29, 2017 at 3:09:17 PM EDT
**To:** "'Gene Linkmeyer'" <<u>gene@linkmeyerlaw.com</u>>

Gene,

How about this:

*Roderik Alewijnse*
M +1.484.802.0909

**From:** Gene Linkmeyer [<u>mailto:gene@linkmeyerlaw.com</u>]
**Sent:** Wednesday, March 29, 2017 1:38 PM
**To:** Alewijnse Roderik <<u>ralewijnse@gmail.com</u>>
**Subject:** Deval Corp
**Importance:** High

We would like to report to the Court that we have identified a potential buyer/investor who is interested in Deval as a going concern.

We would like to report that the potential buyer/investor is in the midst of conducting informal due diligence, has made informal proposals to three banks, two of which have indicated interest in participating in a process which starts with receiving additional due diligence.

Please advise if this report is acceptable, thanks.

DEV-0225

Best,

_____

Gene M. Linkmeyer, Esq.
610-348-6899
Gene@LinkmeyerLaw.com  |  www.LinkmeyerLaw.com | @BizDivPA



LINKMEYER
LAW GROUP

*The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individuals or entities named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and purge this communication immediately without making any copy or distribution. To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter(s). To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.*

=



**BIG SHOULDERS**
C A P I T A L

HELPING BUILD A STRONGER FUTURE

March 21, 2017

Mr. Dominic Durinzi
**DeVal Corporation**
7341 Tulip Street
Philadelphia, PA 19136

RE: Loan Proposal

BY ELECTRONIC MAIL:  dominicdj@msn.com; rgreenbaum@skhlaw.com

### INDICATION OF INTEREST

Based upon our conversation and the information that you supplied, Big Shoulders Capital LLC ("BSC") is pleased to present the following outline of potential financing for DeVal Corporation ("Company"). This proposal is for discussion purposes only and is intended to demonstrate BSC's preliminary interest, but in no way should be considered as an offer or commitment by BSC to provide financing to Company. In this regard, we present the following for your consideration:

| | |
|---|---|
| **MAXIMUM LOAN FACILITY:** | $1,800,000 Senior Facility, including fees, interest reserves, and costs, and comprised of a Term Loan (collectively, the "Facility"). |
| **TERM LOAN A:** | $1,000,000 Senior Term Loan, including fees, interest reserves, and costs, as hereinafter described (the "Term Loan A"), based upon the lesser of 70% of appraised net forced liquidation value (NFLV) of the machinery and equipment assets or **$1,000,000.** |
| **TERM LOAN B:** | $800,000 Senior Term Loan, including fees, interest reserves, and costs, as hereinafter described (the "Term Loan B"), based upon the lesser of 50% of appraised net forced liquidation value (NFLV) of real estate or **$800,000.** |
| **INTEREST RATES:** | Prime plus 11% per annum. |
| **CLOSING FEE:** | 1.5% |
| **EXIT FEE:** | 2% |

**SECURITY & COLLATERAL:**

**USE OF PROCEEDS:**

Estimated use of Proceeds include:
- To finance the outstanding debt obligation to BB&T Bank;
- Payment of the Closing Fee;
- Outstanding Closing expenses, if any.

**CLOSING DATE:**

4/11/2017.  BSC recognizes time is of the essence.

**TERM:**

24 months from the Closing Date.

**REPAYMENT:**

Term Loan A: 3 months of interest only followed by Principal and Interest payments assuming a 48 month amortization

Term Loan B: 6 months of interest only followed by Principal and Interest payments assuming a 60 month amortization.

Company agrees to automatic payment and fee deductions by BSC on the Facility.

**LOAN ADMINISTRATION FEE AND MONITORING FEE:**

$500 per month, payable in arrears.

**MINIMUM INTEREST OBLIGATION:**

Facility shall have a nine (9) month minimum interest obligation.

**DUE DILIGENCE/EXPENSE DEPOSIT:**

$1,500.00 Due Diligence/Expense to be pre-paid in cleared funds upon execution of this proposal.  Due diligence fees are non-refundable and fully earned upon completion of due diligence, the results of which are confidential, and are not provided to the Company for review.  BSC will make reasonable efforts to minimize expenses related to diligence/loan documentation.

**COLLATERAL REPORTING:**

Monthly Equipment Certification Certificates; Equipment Certification Certificates to be certified by an Officer of the Company.

**FINANCIAL REPORTING:**

Monthly financial statements certified by an Officer of the Company and fiscal year-end financial statements reviewed by an outside accounting firm acceptable to BSC. All financial statements and certificates must be certified by an Officer of the Company.

Financial projections, in form, content, and at intervals satisfactory to BSC.

## BIG SHOULDERS CAPITAL
105 Revere Drive / Suite D / Northbrook, IL 60062
P: 224-927-5330 / www.bigshoulderscap.com

DEV-0228

**LEGAL COSTS:**      Actual fees to be paid by Company; BSC's legal counsel only represents BSC, respectively, and does not represent the Company or any Guarantors.

**GUARANTORS:**      Personal guarantee of any shareholder holding 20% or more of equity of Company as well as subsidiaries or affiliated companies.

**VALIDITY OF COLLATERAL:**      The appropriate officers of Company will represent and warrant that the collateral pledged to BSC represents bona fide existing collateral and is free from other liens and encumbrances.

**BACKGROUND CHECK:**      Relevant officers, shareholders, or employees identified during Due Diligence will authorize BSC to conduct a background check by completing, executing and returning the attached Background Consent Form.

**INSURANCE:**      Company shall maintain liability and casualty loss on the collateral generally reflecting the terms and conditions of this proposal with BSC named as an "additional insured" and primary beneficiary.

**TIMING:**      We anticipate due diligence and documentation to be completed within 2 – 3 weeks from the acceptance of this proposal and the receipt of the due diligence fee in cleared funds.

**OTHER CONTINGENCIES:**      Covenants shall be developed during the course of BSC's Due Diligence process.

Conditions Precedent to Funding; Representations and Warranties; and Events of Default shall be usual and customary for transactions of this size and nature.

Landlord waivers acceptable to BSC.

Inter-Creditor Agreement acceptable to BSC.

**GOVERNING LAW:**      This proposal shall be governed by and under the laws of the State of Illinois. This proposal may be executed in counterparts.

BIG SHOULDERS CAPITAL

105 Revere Drive / Suite D / Northbrook, IL 60062

P: 224-927-5330 / www.bigshoulderscap.com

DEV-0229

No party other than the foregoing may rely on the terms and conditions herein. This offer is not assignable.

Please review the above and contact me at (224) 927-5329 with any questions you may have. This proposal will be in effect until 5:00 PM (CST), 3/28/2017 unless extended in writing by mutual agreement.

In order to proceed with the above proposal, please sign and return the signed proposal by email to linda.budz@bigshoulderscap.com, submit the Due Diligence Fee of $1,500.00 via wire transfer (wire instructions attached) with the attached Application Form which also needs to be completed and remitted with the deposit. Upon receipt of funds, we will commence our Due Diligence.

Sincerely,

BIG SHOULDERS CAPITAL LLC

*Linda Budz*

Linda Budz
Business Development

**Proposal Accepted by:**

_____

DeVal Corporation

_____

Date

BIG SHOULDERS CAPITAL
105 Revere Drive / Suite D / Northbrook, IL 60062
P: 224-927-5330 / www.bigshoulderscap.com

DEV-0230

## Big Shoulders Capital LLC
### Wire Transfer Instructions

| | |
|---|---|
| Bank Name | **The Private Bank** |
| Address | **120 South LaSalle** |
| City/State | **Chicago, IL 60603** |
| Phone # | **312-564-2000 Option #2** |
| ABA # | 071006486 |

*For Credit to:*

| | |
|---|---|
| Customer Name | **Big Shoulders Capital LLC** |
| Address | **105 Revere Drive, STE D** |
| City/State | **Northbrook, IL  60062** |
| Office Phone | **224-927-5330** |
| Account Number | 2432550 |

BIG SHOULDERS CAPITAL
105 Revere Drive / Suite D / Northbrook, IL 60062
P: 224-927-5330 / www.bigshoulderscap.com

DEV-0231

# Quality Products, Inc.

April 8, 2016

Dominic Durinzi
DeVal Corporation
7341 Tulip St
Philadelphia, PA  19136

Re: Letter of Interest

Dear Dominic:

We are pleased to submit the following proposal regarding the acquisition of DeVal Corporation ("DeVal" or the "Company") by certain investment affiliates of Quality Products Inc. ("QPI").

QPI is a privately-held industrial holding company based in Chicago, IL. QPI has completed seven acquisitions of small industrial companies since 2003, and currently has over $50mm of revenue and $8.5mm of EBITDA.

QPI is prepared to commit significant resources and move quickly in completing any potential transaction in an effort to meet any reasonable schedule established by you.  In order to make a definitive proposal to acquire the Company, we would need to complete our standard due diligence investigation, which would include meetings with Company management as well as a review of the facilities and applicable business, legal, financial, tax, environmental and accounting matters.

Certain key terms and conditions of our proposal are outlined below.

1.  *Purchase Price*.  Based on the financial and other information that we have reviewed to date and our understanding of the business, we propose two option, both of which establish a NewCo:

    (a) to acquire 100% of the assets of the Company (the "Transaction Option A") at a value of $3.6m (the "Transaction Option A Value").  or;

    (b) to acquire 80% of the assets of the Company (the "Transaction Option B"), with the current owners holding 20% of the new entity, at a total valuation of $4.2m (the "Transaction Option B Value").   The then minority owners would have a "put" to QPI in three years at 3x the then trailing twelve month EBITDA. This option would work as follows:
        (i)  Upon closing, QPI will pay 80% of $4.25m. ($3.4m)
        (ii)  As minority owners, you would own 20% of the Newco.  You would be responsible for 20% of the taxes on profit (similar to 100% today).  Our intention would be to make proportional tax distributions periodically (likely quarterly) to both QPI and minority owners to cover expected tax obligations.
        (iii) You would receive 20% of any additional dividends or distributions made by the Newco.

DEV-0232

# Quality Products, Inc.

(iv) At the end of three years, the minority owners would "put" their equity ownership to the Newco for 3x the most recent trailing twelve month EBITDA (the "Put Value"). This Put Value would be offset by a deduction for any additional working capital required to be invested in the business above the current level of working capital.

Both of the options presented also will be contingent on adjustment to management compensation to reflect more closely the QPI current management compensation structure. We will work with you to structure the transaction in a way that is mutually tax beneficial to both the Company and QPI. Our value reflects the limited nature of the information provided to us, and it is possible that subsequent to further conversations with management and the completion of due diligence, we may be prepared to consider a transaction at a value in excess of this level.

2. *Sources of Capital*. The financing for the Transaction would be in the form of debt and equity capital provided by QPI. Under Transaction Option B, we anticipate that management personnel of the company would have significant equity ownership of the Company pro forma for the transaction.

3. *Conditions, Due Diligence and Documentation*. Our obligation to consummate the Transaction will be subject to customary conditions for transactions of this type, including but not limited to: (i) satisfactory completion of business, financial, accounting, tax, environmental, insurance, benefits, and legal due diligence; (ii) conducting satisfactory discussions with key customers and suppliers; (iii) negotiation and execution of mutually satisfactory definitive agreements (the "Definitive Agreements"), including management compensation; (iv) receipt of all necessary governmental and third party consents and approval.

4. *Confidentiality*. We expect that you will keep the terms of this proposal confidential and will not disclose such terms, or the fact that this proposal has been submitted, to any third party. Given our desire to pursue this opportunity, we stand ready to provide any clarification or to answer any questions that you may have regarding this letter.

5. *Non-Binding Nature of Proposal*. At this stage of the process, our proposal is not intended to be legally binding and is subject to, among other things, the conditions noted above.

6. *Key Contacts*. Given our desire to pursue this opportunity, we stand ready to provide any clarification or to answer any questions that you may have regarding this letter. Please do not hesitate to contact David Somers with QPI at (312) 925-0213.

Sincerely,

David Somers
CEO
Quality Products, Inc.
2222 South Third Street
Columbus, OH  43207

DEV-0233

## Zinnen Growth Management, LLC
www.Zinnengrowth.com

August 22, 2016

**PRIVATE & CONFIDENTIAL**
Dominic J. Durinzi and Ron Penska
DeVal Corporation
http://www.devalco.com
7341 Tulip Street
Philadelphia, PA 19136

Dear Ron and Dom:

I am interested in acquiring DeVal Corporation, providing you with a transition program and exit strategy and partnering with you and the DeVal Team to grow the business post-sale. This indication of interest ("IOI") will outline the sort of transaction/transition which we feel works best for both firms.

Below, we have outlined a transaction which we feel is a win/win for all parties. With the investments I intend to make in money, time and expertise, as long as DeVal's foundation is sound and you are truly willing to help transition and grow the business, it seems highly probably your total payout will exceed the current value of the business.

1. **Buyer** – The Buyer will be one or more legal entities formed by me and/or one or more partners. Until the new legal entity is formally created, it will be designated herein as NewCo. Depending on the advice of legal counsel, I may form a separate legal entity to acquire the real property.

2. **Zinnen Background**
   a. My personal background includes West Point, the U.S. Army, a series of executive leadership positions and now, while looking for the family's next platform company, I am running a non-traditional private equity and investment advisory firm called Zinnen Growth Management.
   b. Using the M&A resources and deal flow of RLS Associates http://www.rlsassociates.com (Delaware's Oldest and Largest M&A Firm) and the networks of its principals, I will be using a combination of equity and financial leverage to acquire and grow closely held businesses.
   c. I have a strong preference for retaining management.

3. **Transition**
   a. In all likelihood, we would retain the existing team in place and keep the DeVal name (and/or some version thereof) active in the market post-closing. Our plan is to offer employment to the staff and, subject to interviewing and acceptance of the continued employment, we would expect the team to remain virtually intact following Closing.
   b. We will work together to develop a plan for a very smooth and effective transition process.

4. **Sellers** – Ronald Penska and Dominic J. Durinzi as sole shareholders of DeVal Machine Co. ("Sellers") own 100% of the shares of DeVal, all of which shares Buyer will acquire (the "Shares") and as part of that acquisition, a 338(h)(10) election will be made.

5. **Closing** -- The Closing will be targeted for November 18, 2016, but we will close sooner, if possible.

6. **Deal Structure**
   a. This would be structured as an acquisition of substantially all of the equity interests of the DeVal Corporation. As a result of the acquisition of the Shares, the following acquired assets,

Draft for Discussion Purposes, Still Under Legal, Tax and Client Review

DEV-0234

as set forth in more detail on Addendum A hereto, shall be hereafter known as the "Assets" will also transfer to Buyer.

b. In addition to the acquisition of the Shares, Buyer will also acquire your existing locations, 7341 Tulip Street and 7357 Keystone Street (both in Philadelphia, PA 19136), as well as the garage/property which is located at 7328 Tulip Street in Philadelphia, PA 19136 which is owned by Dom and Ron (collectively, the "Facilities") and any other real estate utilized by Deval in a transaction just prior to the acquisition of the stock, through a related real estate acquisition entity formed for that purpose.

c. Furthermore, the Buyer (by virtue of the acquisition of the Shares) will assume select non-interest bearing Current Liabilities of Seller (the "Assumed Liabilities"), as more fully defined on Addendum A, but specifically excluding any interest bearing debt and amounts owed to any related entities of Seller and/or their equity owners.

d. In addition, Buyer expects to enter into mutually agreeable arrangements with key management team members, specifically including, but not limited to: Dominic J. Durinzi and Ronald Penska (respectively "Dom" and "Ron"), which achieves their post-closing objectives and provides for a smooth business transition. These arrangements will address both the transition period as well as any post-transition ongoing operating roles in the business. The expected terms of employment are included in Addendum B attached hereto.

7. **Targeted Purchase Price For the Assets of Company** – In light of the need for the Buyer to infuse additional working capital to operate DeVal on an ongoing basis, for hiring a salesforce, upgrading and purchasing of additional equipment and initiating other business development activities in order to grow the business, we are working toward a purchase price package of approximately One Million and Seven Hundred Thousand Dollars ($1,700,000) for the existing business **PLUS** the value of the Facilities for what we are estimating to be a total package value of $3.3 Million **PLUS** an additional promissory note which would bring the total package price up to $3.6 Million. This offer is based on our understanding that Seller has historically had approximately $8.3 Million or more in Revenues Per Year on which it generates approximately $630,000 of Adjusted Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") per year which is the net result of taking the reported sellers compensation and discretionary/personal expenses and then subtracting a replacement salary for the Sellers and for Mr. Zinnen, and a fair market value ("FMV") rent expense on the Facilities (the "Benchmark Profit Level"). That being said, the parties understand that the 2016 financial results will likely be between $6.6 and $7.0 Million with lower Adjusted EBITDA as well. Please understand, that in preparing this potential offer range, we have based it on our understanding of how inventory, inventory write offs and Sales, General and Administrative Expenses were/are treated.

8. **Deal Components**

a. <u>**Acquisition of Equity**</u>
    i. **Cash at Closing for Acquisition of Assets**
        1. **Business Purchase** --- One Million and Seven Hundred Thousand Dollars ($1,700,000) in cash/certified funds will be paid at Closing for the Assets ("Cash Payment").
        2. **Facilities Acquisition** --- In addition, Buyer will pay a cash payment for the Facilities at Closing equal to the appraised value Fair Market Value ("FMV") which is expected to be One Million and Six Hundred Thousand Dollars ($1,600,000) and which Buyer will pay by wire transfer.
    ii. **Promissory Note** --- In addition, Seller will receive two subordinated contingent promissory notes in the aggregate amount of Three Hundred Thousand Dollars ($300,000) (each a "Seller Note").
        1. The first Seller Note ("Note 1") in the amount of One Hundred Thousand Dollars ($100,000) will be payable beginning in the 2nd month following

Closing over the next 36 months with payments of approximately $2,952.40 per month ("Note 1").

2. The second Seller Note ("Note 2") in the amount of Two Hundred and Thousand Dollars ($200,000) will be payable beginning in the 26th month following Closing over the next 48 months with payments of approximately $4,515.81 per month ("Note 2").

3. To be able to afford and justify the additional purchase price, the business must reach certain financial obtainment levels. Accordingly, the payments for Notes 1 and 2 will only be paid in any calendar month in which the business generates Forty-One Thousand Six Hundred and Sixty-Six Dollars and Sixty-Seven Cents ($41,666.67) or more of EBITDA. If EBITDA falls short of the cash flow test, that month's payment will be forgiven, unless the Adjusted EBITDA for the entire calendar year totals Five Hundred and Thousand Dollars ($500,000) or more ("Annual Adjusted EBITDA Level"), in which case any monthly payments skipped will be paid to Seller once the Annual Adjusted EBITDA level is achieved.

iii. **Excluded Assets** --- In addition, Seller will retain the Excluded Assets.

iv. **Holdback/Right of Set Off** – In order to maximize the amount of the Cash Payment available to the Seller and its shareholders at Closing, Buyer will only require a holdback as security against reps, warranties and indemnifications of One Hundred Thousand Dollars ($100,000) ("Holdback Amount") and will offset any other claims it might have against the Seller Note. At Closing, the Holdback Amount will be placed in an interest-bearing account with any remaining Holdback balance paid to Seller on the first anniversary of Closing.

v. **Assumption of Liabilities** --- Buyer will assume only those liabilities of the Seller which are specifically listed on Addendum A.

vi. **Purchase Price Allocation** --- $1.6MM will be allocated to the purchase of the Facilities, $2.1 Million will be allocated to the purchase of the Inventory and $300,000 will be allocated to the purchase of the fixed assets. {{Need to discuss this in much more depth before finalizing.}}

b. **Purchase Price Adjustments** – The Definitive Purchase Agreement (the "Agreement") will provide for a dollar-for-dollar adjustment of the Cash Payment at Closing based on the actual GAAP book value of the Net Working Capital acquired by Buyer at Closing as compared to those values as of December 31, 2015 ("Benchmark Date"). Based on the 5/31/16 Balance Sheet with which we were provided, the Current Assets acquired by Buyer would be approximately $2,745,000 which is what is expected at Closing. Seller will not divest of any of its other assets prior to Closing without Buyer's pre-approval and will continue to maintain those assets in good working order and condition.

9. **Ancillary Agreements** - Concurrently with the Closing and the execution of the Agreement, the following agreements will also be executed by the Parties: (a) Transition, Confidentiality, and Employment Agreements; and (b) Non-Competition and Non-Solicitation Agreements. Said Non-Competition and Non-Solicitation Agreements will be generally for five (5) years from the date on which Dom and/or Ron leave(s) employment with Buyer.

10. **Conditions Precedent and Other Terms** -- The Closing of the Transaction will also be subject to normal and customary express conditions, including, but in no way not limited to: (a) Due Diligence, (b) The execution of the Agreement among Buyer and the Seller, (c) Inspection and review of the Customer Base, (d) Ron and Dom will help to transition the business to Buyer and to the extent mutually agreeable, will continue to work in the business on mutually agreeable terms. During that time, Ron will need to maintain major customer relationship due to the high customer concentration, provide introductions and attend meetings, (e) the retention of key

employees post-closing, (f) transfer of AS, Mil-Specs and ISO compliance, as well as any other certifications, in a non-encumbered/clean manner to Buyer, (g) Seller's repayment in full of the actual balances of liabilities set forth on Addendum A at Closing as well as any remaining legal fee balances to Joe Capozzoli, (h) potentially securing tail insurance coverage if, after Buyer's review of the Company's insurance policies, it feels tail coverage is needed, and (i) Financing.

11.   **No Shop -** In consideration of Buyer's time and expense in pursuing an acquisition of Company, the Seller, its officers, equity owners and advisors will keep the details of Buyer's offer strictly confidential and will not directly or indirectly solicit, discuss, encourage, participate in any negotiations, accept any offers or enter into any agreement for the purchase of the Company or the Assets, or take any other action with the intention or reasonably foreseeable effect of leading to any commitment or agreement to sell or encumber the Company, the Assets, the stock of the Company for ninety (90) days from the date of the execution of this document. In the event that the Company fails to comply with the terms of this No Shop provision, Buyer will be entitled to a payment of liquidated damages, the sufficiency and adequacy of which are hereby agreed to, from the Company in the amount of One Hundred Thousand Dollars ($100,000.00).

12.   **Costs and Expenses -** All costs and expenses of each party, including, but not limited to, any and all:  (a) legal; (b) accounting; (c) investment banking/business brokerage; (d) sales, income and/or real estate or other transfer taxes; and (e) due diligence expenses, to be borne by the respective party.

13.   **Non-Binding Nature –** With the sole exception of the terms of Section 11 above which shall be binding, this document is not otherwise a binding agreement, and, as such, this is merely an expression of the parties' intent, and thus neither party, nor any person affiliated with either party, shall have any liabilities or obligations hereunder, other than for obligations under Subsection 11.

Together, we are much stronger and much more likely to increase the rate and magnitude of success for our companies, which is how the game is won. I look forward to working together with you to grow the businesses. Please don't hesitate to let me know if you have any questions or comments.

Best regards,

Robert Zinnen
President

This Letter of Intent will expire if not accepted in writing by 4:00 p.m. EST on August 26th (the "Expiration Date"). Accordingly, please execute in the space provided below to signify your acceptance of this proposal and your agreement to proceed in good faith to attempt to consummate the transaction set forth hereinabove.

**DeVal Corporation**

_____          _____
Mr. Dominic J. Durinzi, President                          Date


_____          _____
Mr. Ronald Penska, Vice President                        Date

Draft for Discussion Purposes, Still Under Legal, Tax and Client Review

DEV-0237

## ADDENDUM A

**Acquired Assets** --- All items/assets used in, or useful in, the pursuit of the business operations of Seller including, but not limited to:

1. Cash
2. Trade Accounts Receivable and Undeposited Funds
3. Inventory and Supplies (Good, Marketable and Current Inventory and WIP Inventory)
4. Purchase Warranty Reserve
5. Prepaid Expenses
6. Prepaid Insurance
7. Security Deposits
8. Machinery, Equipment, Fixtures, Tools, Tooling and Molds
9. Building Improvements
10. Office Furniture, Fixtures and Office Equipment
11. Software
12. Intellectual Property, patents, etc.
13. Trade name (and any relevant permutations thereof)
14. Existing contracts and purchase orders
15. Cage Codes and any government contracting or identification
16. Phone Number(s)
17. IP Address, Domain Name and Website
18. ISO, AS or other certifications
19. Facilities
20. DACVAL, LLC

**Excluded Assets** --- Seller will retain its ownership of the following Excluded Assets at Closing:

1. Personal Vehicles of Ron and Dom

**Assumed Liabilities** ---- Trade Accounts Payable and Accrued Expenses

**Excluded Liabilities** --- Continued on Next Page

Draft for Discussion Purposes, Still Under Legal, Tax and Client Review

## ADDENDUM A
### Continued on Next Page

**Excluded Liabilities** — Seller will retain its responsibility for all Liabilities not listed above as Assumed Liabilities at Closing, and will pay off the following liabilities and/or any similar liabilities at Closing:

**Deval Corporation Notes Payable - Bank (Excludes Equipment Leases and Loans)**

| Lender and Loan Description | 6/26/2014 Balance | 6/30/2016 Balance | Projected Balance | Notes |
|---|---|---|---|---|
| Susquehanna Bank - SBA Loan | $1,156,354 | $1,009,000 | $917,000 | Term Note. Maturity in 7-14-22. |
| Susquehanna Bank - Term Loan | $330,000 | $217,000 | $150,000 | Term Note. Maturity in 2-14-18. |
| Susquehanna Bank - Sats Credit Line | $198,000 | $163,000 | $0 | $1,000,000 Maximum Non-Revolving Credit Line. Matures 6-30-15. |
| Direct Capital - Faro Arm | $0 | $13,000 | $0 | $800,000 Maximum Non-Revolving Credit Line. Maturity 5-25-16. |
| Susquehanna Bank - Revolving Credit Line | $222,000 | $634,000 | $605,000 | $500,000 Maximum Non-Revolving Credit Line. Matures 6-30-16. |
| Capozzoli Buyout | | | $359,000 | Term Note. Maturity 5/22/20 |
| ISH Investment Capital | | $451,000 | $600,000 | could be $500K-$650K |
| Susquehanna Bank - Working Capital Credit Line | $268,400 | | $0 | $400,000 Maximum Non-Revolving Credit Line. Matures 9-30-14. |
| **NOTES PAYABLE TOTAL** | **$2,174,754** | **$2,487,000** | **$2,631,000** | |

**Deval Corporation Equipment Leases and Loans**

| Lender and Loan Description | 6/26/2014 Balance | 6/30/2016 Balance | Projected Balance | Notes |
|---|---|---|---|---|
| Wells Fargo - Haas | | $86,000 | $55,000 | |
| Wells Fargo - Miller Welder | | $80,000 | $50,000 | |
| Susquehanna - Haas VF-4 | | $61,000 | $48,000 | |
| Susquehanna - Haas CNC Lathe 1 | | $55,000 | $43,000 | |
| Susquehanna - Haas CNC Lathe 2 | | $95,000 | $80,000 | |
| | | | | |
| | | | | |
| **EQUIPMENT DEBT PAYABLE TOTAL** | **$0** | **$377,000** | **$276,000** | |
| **TOTAL DEBT** | | **$2,864,000** | **$2,907,000** | |

Draft for Discussion Purposes, Still Under Legal, Tax and Client Review

DEV-0239

ADDENDUM B
Employment of Key Employees

1. **Arrangement** --- As mentioned above, Buyer envisions making employment offers to Seller's current employees, once Buyer acquires the Assets.
2. **Compensation** --- Buyer will have specific discussions with each employee, but the general thought process at present is that, with the exception of the owners, their compensation package will be substantially similar to what is currently offered to them according to the information provided by Seller.
3. **Seniority** --- In addition, seniority commensurate with the employees' term of service with Seller will be carried over with respect to any benefit entitlement which is related to years of service in Buyer's company.
4. **Benefits** --- As indicated previously, based on what was disclosed to us with respect to Seller's current benefits package, although there may be some differences, on a net basis, Buyer's intention is to institute a very similar plans so that benefits are very comparable.
    a. To the extent enrollment periods are out of sync, it may be necessary to structure a bridge period during which those employees remain on Seller's benefit plans while the enrollment process takes place. In the event Seller incurs any costs related thereto, Buyer will reimburse Seller for said costs.
5. **Expectations** --- All key employees of Buyer are required to execute non-competition and confidentiality agreements. Depending on what agreements of that source are in place with Seller and the assignability of any such agreements, Buyer, in its sole discretion, may elect to have some of the preexisting non-competes assigned to Buyer. Otherwise, new ones will be entered into with each key employee as a condition of employment. Due to the compressed time frame to Closing, it is essential that in depth discussions with each of the employees Buyer intends to hire take place immediately. Therefore, upon the execution of this Letter of Intent, Buyer and Seller will cooperate to schedule meetings/interviews for Buyer with employees identified by Buyer as being considered for employment.
6. **Dom's Employment Arrangement** will generally be as follows:
    a. **Responsibilities** --- Dom's responsibilities, other than corporate administration, financial oversight and executive management of corporate affairs, will remain basically the same.
    b. **Title** --- President
    c. **Nature of Initial Employment** --- Dom will be a full time employee of Buyer and will be provided with a one (1) year employment agreement with employment thereafter being subject to at will employment. As part of his employment, it is anticipated that his average work hours per week will be between 40 and 50 hours per week with occasional overnight travel.
    d. **Salary** --- $200,000 based on full time employment.
        i. Buyer is flexible to adjust compensation and hours if Dom wants to work less in later years.
        ii. Dom will also receive 1/3 of Annual Free Cash Flow after debt service up to a maximum of $50,000 per year, unless his base salary is increased to an annual amount of $250,000.
    e. **Basic Incentive Compensation** --- Dom will receive an additional bonus of $30,000 in any year in which the DeVal portion of Buyer's revenues exceed $8,800,000 of Revenues, plus an additional $30,000 in any year in which the DeVal portion of Buyer's revenues exceed $9,300,000.
    f. **Growth Incentive Compensation** --- In addition, Dom will receive 5% of the Gross Profit of the DeVal portion of Buyer's business in excess of $2,500,000 during any year in which he works at least 30 hours per week for Buyer.
    g. **Other Compensation and Fringes** --- This package also includes four (4) weeks of vacation, group health benefits commensurate with other employees of Buyer with comparable levels, reimbursement for work-related travel expense and mileage reimbursement from the Facilities at the Internal Revenue Service published rate, etc.
        i. For purposes of clarity, the Buyer will pay the same portion of Dom's benefits costs as it does for other full time employees.

Draft for Discussion Purposes, Still Under Legal, Tax and Client Review

7. **Ron's Employment Arrangement** will generally be as follows:
   a. **General** --- As mentioned previously, we have based our structure on our initial understanding that Ron is not looking to remain post-closing on a full time basis for more than two years post-closing.
   b. **Responsibilities** --- Ron's responsibilities will basically be focused on helping to operate the business in a similar fashion to what he has done for years and to transition his operating and technical knowledge, as well as the management functions in which he typically plays a key role. In addition, subject to his willingness and availability to do so, Ron will also be involved in general management and strategic planning.
   c. **Title** — Vice President
   d. **Nature of Initial Employment** --- Ron will be a full time employee of Buyer and will be provided with a one (1) year employment agreement with employment thereafter being subject to at will employment. As part of his employment, it is anticipated that his average work hours per week will be between 40 and 50 hours per week with minimal overnight travel.
   e. **Salary** --- $150,000 based on full time employment. Buyer is flexible to adjust compensation and hours if Ron wants to work less in later years.
      i. Ron will also receive 1/3 of Annual Free Cash Flow after debt service up to a maximum of $50,000 per year, unless his base salary is increased to an annual amount of $250,000.
   f. **Basic Incentive Compensation** --- Ron will receive an additional bonus of $25,000 in any year in which the DeVal portion of Buyer's revenues exceed $8,800,000 of Revenues, plus an additional $25,000 in any year in which the DeVal portion of Buyer's revenues exceed $9,300,000.
   g. **Growth Incentive Compensation** --- In addition, Ron will receive 4% of the Gross Profit of the DeVal portion of Buyer's business in excess of $2,500,000 during any year in which he works at least 30 hours per week for Buyer.
   h. <u>**Other Compensation and Fringes**</u> --- This package also includes four (4) weeks of vacation, group health benefits commensurate with other employees of Buyer with comparable levels, reimbursement for work-related travel expense and mileage reimbursement from the Facilities at the Internal Revenue Service published rate, etc. while Ron is full time with Buyer.
      i. <u>For purposes of clarity, the Buyer will pay the same portion of Ron's benefits costs as it does for other full time employees.</u>

Best regards,

Robert Zinnen
President

This Letter of Intent will expire if not accepted in writing by 4:00 p.m. EST on September 1st (the "Expiration Date"). Accordingly, please execute in the space provided below to signify your acceptance of this proposal and your agreement to proceed in good faith to attempt to consummate the transaction set forth hereinabove.

DeVal Corporation

_____          8/31/16
Mr. Dominic J. Durinzi, President              Date

_____          8/31/16
Mr. Ronald Penska, Vice President             Date

DEV-0242

3/31/2017
RE: DeVal conference call - Dominic Durinzi

# RE: DeVal conference call

**Sam Thevanayagam** <sam@partslifeinc.com>

Tue 2/28/2017 7:31 PM

To:Joerf <joerf@aol.com>;

Cc:James Emerich <jim@partslifeinc.com>; dominicdj@msn.com <dominicdj@msn.com>;

Jim please share with Joe our accountant's information. We meet with him on Thursday. Maybe we talk when we are together. Sam

*Sam Thevanayagam* | President
**PARTS LIFE, INC.**  |  30 Twosome Drive  |  Moorestown, NJ 08057
Phone: 856-786-8675  |  Fax:  856-786-8677  |  www.PartsLifeInc.com

*IMPORTANT CONFIDENTIALITY NOTICE: This e-mail and any attachments and/or documents linked to this email may contain information that is confidential or legally privileged. These documents are intended only for the use of the individuals or entities to which it is addressed. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing, or copying of this e-mail message and/or any attachments or taking any action based on the information contained within them, is strictly prohibited and may be unlawful. It is the responsibility of the recipient (s) of this email to ensure that its contents including any attachments are controlled as such to remain in complete compliance with the U.S. Arms Export Control Act, the International Traffic in Arms Regulations, and the Export Administration Act. If you have received this transmission in error, please notify the sender immediately and permanently delete this e-mail and any attachments.*

**From:** Joerf [mailto:joerf@aol.com]
**Sent:** Tuesday, February 28, 2017 3:57 PM
**To:** Sam Thevanayagam <sam@partslifeinc.com>
**Cc:** joerf@aol.com; James Emerich <jim@partslifeinc.com>; dominicdj@msn.com
**Subject:** DeVal conference call

Sam,
We just finished the conference call.
A lot of good information. Not an easy scenario.
I need to speak with your accountant, and have Dom send his 2016 financials to your accountant, as well as to his attorney, Dave Smith.
Please send us the contact information.
I may not be able to speak with your accountant until Thursday morning.
Traveling tomorrow.
Hope all else is well.
Joe

Sent from AOL Mobile Mail

-----Original Message-----
From: Dominic Durinzi <dominicdj@msn.com>
To: Joerf <joerf@aol.com>
Sent: Mon, Feb 27, 2017 06:53 PM

DEV-0243

3/31/2017                                              RE: DeVal conference call - Dominic Durinzi

Subject: RE: Lunch meeting & next steps


No problem Joe, if you like any questions answered by the attorneys prior to the call please send them to me. If not we will talk at 3:00pm. I will call you and conference you in. Thanks.



Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Joerf <joerf@aol.com>
Date: 2/27/2017 6:11 PM (GMT-05:00)
To: dominicdj52@gmail.com, dominicdj@msn.com
Subject: Fwd: Lunch meeting & next steps

Hi Dom,
This is the e-mail you were referring to, and yes, I had seen it.
Sorry for the confusion.
Joe


——Original Message——
From: Sam Thevanayagam <sam@partslifeinc.com>
To: Joerf <joerf@aol.com>; dominicdj52 <dominicdj52@gmail.com>
Cc: James Emerich <jim@partslifeinc.com>; hystick93 <hystick93@aol.com>
Sent: Sun, Feb 26, 2017 8:09 pm
Subject: RE: Lunch meeting & next steps

Gentlemen please note that this address is only until March 31st. Joe thanks for sharing. We wont drop in on you!!!. For mail only.  Kind Regards, Sam

*Sam Thevanayagam* | President
**PARTS LIFE, INC.**  |  30 Twosome Drive  |  Moorestown, NJ 08057
Phone: 856-786-8675  |  Fax:  856-786-8677  |  www.PartsLifeinc.com

*IMPORTANT CONFIDENTIALITY NOTICE: This e-mail and any attachments and/or documents linked to this email may contain information that is confidential or legally privileged. These documents are intended only for the use of the individuals or entities to which it is addressed.  If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing, or copying of this e-mail message and/or any attachments or taking any action based on the information contained within them, is strictly prohibited and may be unlawful. It is the responsibility of the recipient (s) of this email to ensure that its contents including any attachments are controlled as such to remain in complete compliance with the U.S. Arms Export Control Act, the International Traffic in Arms Regulations, and the Export Administration Act.  If you have received this transmission in error, please notify the sender immediately and permanently delete this e-mail and any attachments.*


From: Joerf [mailto:joerf@aol.com]
Sent: Sunday, February 26, 2017 7:24 PM
To: dominicdj52@gmail.com; Sam Thevanayagam <sam@partslifeinc.com>
Cc: James Emerich <jim@partslifeinc.com>; hystick93@aol.com
Subject: Re: Lunch meeting & next steps

Hi Dom,                                                                                                    **DEV-0244**

3/31/2017                                                          RE: DeVal conference call - Dominic Durinzi

My mailing address beginning March 1 and through March 31 will be:

Joseph R Ford
325 Dunes Blvd
Unit 203
Naples, FL. 34110

Phone will remain the same - 856-498-9649.  Alternate 856-904-6482

Thank you,
Joe

Sent from AOL Mobile Mail

**DEV-0245**

3/31/2017                                            This week - Dominic Durinzi

# This week

Sam Thevanayagam <sam@partslifeinc.com>

Sat 2/18/2017 10:51 AM

To:Joerf <joerf@aol.com>; James Emerich <jim@partslifeinc.com>; Dominic Durinzi <dominicdj@msn.com>;

With Joe & I traveling this week is it possible to do a conference call on Wednesday Feb 22nd morning at 10 am. Please let me know & I will send out an invite and a conference call number. Thanks,

*Sam Thevanayagam* | President
**PARTS LIFE, INC.**  |  30 Twosome Drive  |  Moorestown, NJ 08057
Phone: 856-786-8675  |  Fax:  856-786-8677  |  www.PartsLifeinc.com

*IMPORTANT CONFIDENTIALITY NOTICE: This e-mail and any attachments and/or documents linked to this email may contain information that is confidential or legally privileged. These documents are intended only for the use of the individuals or entities to which it is addressed. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing, or copying of this e-mail message and/or any attachments or taking any action based on the information contained within them, is strictly prohibited and may be unlawful. It is the responsibility of the recipient (s) of this email to ensure that its contents including any attachments are controlled as such to remain in complete compliance with the U.S. Arms Export Control Act, the International Traffic in Arms Regulations, and the Export Administration Act. If you have received this transmission in error, please notify the sender immediately and permanently delete this e-mail and any attachments.*

DEV-0246

# Conference

Sam Thevanayagam <sam@partslifeinc.com>

Tue 2/21/2017 11:30 AM

To:joerf@aol.com <joerf@aol.com>; dominicdj@msn.com <dominicdj@msn.com>; James Emerich <jim@partslifeinc.com>;

Per Sam, please join him on a conference call tomorrow, Wednesday 2/22/17 at 10 AM.
Conference # is 856-389-4703
Passcode # is 1212#
Any questions, please give me a call @ 856-786-8675
Thank you Meredee

DEV-0247

Subj:     **New Prospect**
Date:     3/10/2017 11:04:00 A.M. Eastern Standard Time
From:     gmlesq@gmail.com
To:       hystick93@aol.com, dominicdj@msn.com

Ron---

Is 11am Monday ok for another walk through?  This is with a local defense logistics and military distribution company run by Bill Bernardo and Scott Truskin at http://www.trimanindustries.com/news-updates

They have the cash to do a deal and this looks right up their alley.  Dom wants to make sure the time does not interfere with your production, so let me know if you need to move to Wednesday when he is back.

Best,

Gene Linkmeyer
gmlesq@gmail.com

=

Subj:    **Bill Bernardo**
Date:    3/13/2017 4:46:34 P.M. Eastern Daylight Time
From:    gene@linkmeyerlaw.com
To:      dominicdj@msn.com, hystick93@aol.com

Guys look at Bills question below. I'll try to set up a 10am Tuesday conference call with me, Bill and Dom.

Best,
Gene Linkmeyer
610-348-6899
-Sent from my iPhone

Begin forwarded message:

> **From:** "Bill Bernardo" <wabernardo@comcast.net>
> **Date:** March 13, 2017 at 4:24:58 PM EDT
> **To:** <Gene@LinkmeyerLaw.com>
>
> Gene,
>
> Thank You very much for the time spent this morning. Scott and I have a very serious interest in potentially acquiring the business. It is a fit with our business experience and what we would like to do from an investment perspective.
>
> In the meantime could you clarify a couple things based on this morning's conversations. Ron indicated that prior to the legal issues the business was running at about an $8 Million per year sales level with the majority of activity coming with the DLA (Defense Logistics Agency). According to DLA published information purchases to the DeVal Corporation cage code were not at that level. The following is what the DLA is reporting as purchases by year from DeVal Corporation. Could you clarify the difference.

| Year | Amount |
|------|--------|
| 2017 | $   440,237.63 |
| 2016 | $ 2,463,917.63 |
| 2015 | $ 2,105,375.07 |
| 2014 | $ 2,035,429.68 |
| 2013 | $ 2,382,712.30 |
| 2012 | $ 1,780,611.56 |
| 2011 | $ 2,935,798.88 |
| 2010 | $ 1,325,346.00 |

> As we move forward an understanding of the total sales opportunity and associated margins is critical to establishing a transaction framework. With the pending snow storm, I don't expect to be going anywhere tomorrow. Let me know if Dominic would be available to talk. I can be flexible with his schedule.
>
> Again, Thank You for the time spent today.

Friday, March 31, 2017 AOL: HYSTICK93

DEV-0249

‣ INVENTORY SEARCH (HTTP://SERVICES.TRIMANINDUSTRIES.COM/)    ‣ REQUEST A QUOTE (/REQUEST-QUOTE)



# NEWS & UPDATES



March 2017

## TRIMAN PROUDLY PARTNERS WITH SAINT-GOBAIN OMNISEAL BRAND®

Triman is the DLA distributor of the OmniSeal® brand, a member of Saint-Gobain Seals' family of critical parts engineered for sealing control made from Fluoroloy® polymer materials.  Since the early 1950s, OmniSeal® seals have been widely used for extreme environments in various industries where low friction,

DEV-0250

high load and extreme temperature are required. They are designed to bridge the gap between conventional elastomer lip seals and mechanical face seals.

The OmniSeal® brand includes OmniLip™.

CAGE 05939 & 12599

http://www.seals.saint-gobain.com/ (http://www.seals.saint-gobain.com/)


October 2016

# TRIMAN IS PROUD TO PARTNER WITH TRI-TEC MANUFACTURING

Tri-Tec Manufacturing in Kent, Washington builds tough, reliable components that go the distance. With fire-safe ventilation valves and actuators installed on nearly all of our Navy's surface ships, Tri-Tec is proud of its ability to meet the technological demands of today's Navy and provide innovative solutions to complex systems. The latest line of electronic actuators is completely non-intrusive and allows for remote programming.  Tri-Tec is ISO certified with in-house engineering and manufacturing teams. Their products are all made in the USA!

Tri-Tec has four major product lines:

> 1.   Actuators, both Mil-V-24657 and rugged commercial grade - these actuators can drive from the smallest valves to most of the Navy's largest in both quarter-turn and multi-turn configurations.

> 2.   Small and Large Manual Gearboxes - these units have bronze housings and are nearly indestructible.

> 3.   Fire-Safe Ventilation Valves - made from stainless steel to exacting Navy drawings and available in round or obround, these are the best and most reliable in the business.

> 4.   Flux Drive Magnetic Couplings - newly patented, these couplings solve motor/load combination bearing and seal wear from vibration, improve load performance and save energy.

CAGE 56349 & 98032

Visit Tri-Tec's website:

http://www.tritecmfg.com/ (http://www.tritecmfg.com/)

DEV-0251

August 2016

# MODULAR DEVICES, INC. IS TRIMAN'S NEWEST PARTNER

Modular Devices, Inc. is a privately held U.S. Corporation established in 1973. It specializes in the rapid design, development and manufacture of robust, high reliability DC to DC converters, power supplies, controllers & distribution products for the military, commercial, space and aerospace communities worldwide.

Comprehensive range of in-house engineering and production capabilities allow MDI to be exceptionally responsive to its customers' diverse requirements.

Professional staff optimized for performance to Mil & Space level Quality Assurance and Program Management requirements.

MDI is uniquely capable of coordinating advanced power conversion technologies with professional management to meet or exceed customer challenges.

MDI is proud of our long heritage of accomplishment and customer satisfaction. We remain committed to providing our partners with cutting edge solutions, reducing risk, maintaining rigorous quality standards and control, and fostering long lasting relationships built on communication and trust.

CAGE 52202

Visit MDI's website:

http://mdipower.com/ (http://mdipower.com/)

May 2016

# TRIMAN INDUSTRIES PARTNERS WITH WESTWIND TECHNOLOGIES, INC.

WestWind's products for aviation applications include rotor wing aircraft (H-60 A/L/M, CH-47, Kiowa, and Apache) A and B Kits manufacture and integration. WestWind specializes in build-to-print and custom wiring harnesses, cables, control boxes, electro-mechanical assemblies, precision machining, metal forming, and mechanical assemblies.  System application products include H-60/S-70i ESSS Lightweight Hoist Mission Kit, Air-Crew Microclimate Cooling System, Encrypted Air Warrior Intercom System, Control By-Pass Adapter (CBA).

CAGE 1K9E4

Visit WestWind's website:

http://www.westwindcorp.com/ (http://www.westwindcorp.com/)

DEV-0252

February 2016

## TRIMAN INDUSTRIES PARTNERS WITH STEINER EOPTICS

Steiner eOptics Inc. is known for its state-of-the-art visible and infrared laser aiming devices, tactical lights, and infrared illuminators that are used by military, law enforcement and civilians worldwide. The Steiner eOptics products enable more accurate marksmanship and provide each user with a higher level of confidence and a greater level of safety when firing a weapon. Steiner eOptics holds a number of U.S. patents and maintains an ISO 9001:2008 factory certification.

CAGE 0YR11

Visit Steiner eOptics's website:

http://www.steiner-defense.com/ (http://www.steiner-defense.com/)

## TRIMAN INDUSTRIES PARTNERS WITH ARROWHEAD PRODUCTS

Arrowhead Products is an OEM manufacturer of complex Air Distribution Ducting Systems, supporting most military aircraft flying today. They are a major source to Boeing, Lockheed Martin, Northrop Grumman, GE, Pratt & Whitney, and more.

The Air Distribution Ducting Systems products are used throughout airframe and engine applications including Pneumatic Systems, ECS, Engine Bleed Air, QEC, and EBU. Other products manufactured are Thermal Anti-Ice & Piccolo Tubes, Starter Ducts, Insulation Blankets and Heat Shields. Materials include Titanium, Inconel, Stainless Steel, Composites and Elastomers.

CAGE 70628

Learn more about Arrowhead Products:

https://www.arrowheadproducts.net/ (http://www.arrowheadproducts.net/)

January 2016

## WHIPPANY ACTUATION SYSTEMS IS THE LATEST PARTNER TO JOIN THE TRIMAN ADVANTAGE PROGRAM

Whippany Actuation Systems designs, manufactures & supports engineered electromechanical actuation systems for commercial and military applications, providing maximum value to their aerospace partners.

CAGE 81039

DEV-0253

www.whipactsys.com (http://www.whipactsys.com/)

December 2015

## TRIMAN INDUSTRIES IS TRACE INTERNATIONAL CERTIFIED

Triman Industries has completed a comprehensive background review conducted by Trace International, which is the internationally recognized organization that works with companies to raise anti-bribery compliance standards worldwide.

As a global supply chain distribution company for military aftermarket spare parts, Triman strives for excellence in all business activities and accreditations. Triman has adopted a high level of standards in our Code of Ethics, Code of Conduct and Anti-Bribery Compliance.

Triman is proud to announce that we have been certified by Trace International for Anti-Bribery Compliance.

September 2015

## TRIMAN CELEBRATES 20 YEARS IN BUSINESS

Triman Industries celebrated 20 years in business with a company luncheon at Filomena Cucina Rustica in West Berlin, NJ on Friday, September 18th. Everyone was treated to a 3 course lunch as well as a rolling slideshow that featured photographs and employee-submitted memories from years past. President, Scott Truskin, thanked everyone, past and present, and had created a game prior to the luncheon that required employees to submit three facts about themselves. Throughout the luncheon, Scott would read a grouping of three facts and everyone would have to guess who he was describing. Vice President of Operations, Glenn Bocchetti; Vice President of Sales, Kathy Reynolds; and one of Triman's original employees, Sales Coordinator, Carol Boyle had all prepared something to say about Triman. It was a truly special and unifying event that the employees of Triman will not soon forget.

August 2015

## TRIMAN INDUSTRIES ACCEPTED INTO NEW DLA LAND & MARITIME'S QSLD PROGRAM

DEV-0254

Triman Industries is proud to announce our acceptance into the Qualified Suppliers List of Distributors (QSLD) program for FSC 5961 and 5962. This eligibility identifies Triman's facility CAGE code 0ZBE8 as a qualified distributor eligible to supply FSC 5961 and 5962, military and commercial grade product, as dictated under the Criteria and Provisions document for the QSLD program.

# TRIMAN INDUSTRIES CONTINUED QUALIFICATION IN THE DLA TROOP SUPPORT QSLD PROGRAM

Triman Industries is proud to announce our continued qualification and renewal into the the Qualified Suppliers List for Distributors (QSLD). Triman is qualified under CAGE Code 0ZBE8 for another three year term to be listed as an approved QSL Distributor for Class 2 Threaded Fasteners, Class 3 Threaded Fasteners, Rivets, and Quick Release Pins.

## ABOUT (/ABOUT)

Certificates / Terms & Conditions (/certificates-terms-and-conditions)
Affiliations (/affiliations)
Mission Statement (/mission-statement)
News & Updates (/news-updates)
Conferences (/conferences)

## CAPABILITIES (/TRIMAN-ADVANTAGE-PROGRAM-TAP)

Triman Advantage Program (http://www.trimanindustries.com/triman-advantage-program-tap)
Packaging (/packaging)
Export Management (/export-management)
Quality Control (/quality-control)

## PRODUCTS (HTTP://WWW.TRIMANINDUSTRIES.COM/PARTNERS)

Partners (/partners)
Inventory Search (http://services.trimanindustries.com/edb/ASPSearch.htm)
Request A Quote (http://www.trimanindustries.com/request-quote)

## CONTACT (/CONTACT)

Partner Login (http://services.trimanindustries.com/)




## DeVal Overview
### January 17, 2017

DeVal Corporation is a total industrial consolidated business concern based in the City of Philadelphia, incorporated under the laws of the Commonwealth of Pennsylvania in the U.S.A. for the past 62 years.

DeVal Corporation was founded in 1954 with its roots in several manufacturing areas. Equipment manufacturing, remanufacturing, and turn-key start up, along with long-term logistic and spare part support are the primary customer oriented services offered by DeVal Corporation.

Our customer service oriented team, along with our engineering and reverse engineering capabilities has made DeVal stand out in the fleet as the optimum source for support. Our past and present performance has established DeVal as the sole source supplier of approximately 45 families of legacy Aircraft Support Equipment. These families encompass various types of fuel and Transporter Adapters, Bomb Hoists, Munitions Trailers, Dollies, Maintenance Platforms, Cargo Loaders, Drawbars, Tow Bars, Engine Adapters, Various Weapons Skids and hydraulic, Self Propelled Weapons Loaders, etc. Some of these units have as many as 3000 parts on each different unit. Besides the numerous contracts that are acquired by open bid competition, DeVal has sole source contracts for spare and repair parts.

We are presently certified and in conformance with ISO 9001:2008 and AS9100C. Our Quality Program has additionally incorporated the fundamental philosophies of Total Quality Management (TQM) within the program establishing a foundation for continuous improvement.

During our long existence, the essential personnel were developed by DeVal Corporation to satisfy contractual obligations concerning accelerated turn around, delivery, and surge requirements. Over the years, DeVal Corporation has had a consistent work force core. This core of personnel, comprised of people from all ethnic groups, has developed a team concept that combines their specialized training, skills and experience to complete each manufacturing, and remanufacturing requirement. DeVal Corporation retains its employees and maintains an attractive working atmosphere with comprehensive personnel, OSHA safety, environment protection, and drug free work place policies.

Specialized manufacturing and re-manufacturing or advanced total equipment restoration processes are accomplished through coordination of highly trained and experienced personnel utilizing state of the art equipment, materials, and manufacturing techniques, that has optimize manufacturing time, quality and kept DeVal extremely competitive.

Independent computer software systems have been developed and utilized at DeVal Corporation to monitor and regulate internal performance, vendor performance and external field performance and to include long term usage, annual requirements, and high failure rate items.

Our extensive capabilities allow for multitudes of diverse programs and projects which encompass the following:

1.  Disassembly and sandblasting
2.  Certified welding and sheet metal fabrication
3.  Machining, heat treating and plating
4.  Specialized tooling, die and fixture processing
5.  Hydraulic teardown, assembly and testing with fully equipped hydraulic laboratory.
6.  Electrical assembly and trouble shooting in self contained electronics laboratory.
7.  Engine assembly and dynamometer testing
8.  A self contained polyurethane paint line
9.  Computer assisted stock and inventory control
10. Assembly, finalization and shipping.
11. Certified weight testing.
12. Certified Gage Laboratory
13. Certified NDT Equipment and personnel

The non-dependence on all outside sources mandates the success of DeVal Corporation's manufacturing and remanufacturing program. The reason for this is the 62 year evolution which has enabled DeVal Corporation, with its dedication, desire, and most importantly profound knowledge, to successfully manufacture, design, redesign, modify, and/or remanufacture to print all of the parts and equipment that have entered the facility.

DeVal Corporation is a company with ample experience and many years of working with manufacturing, field services, remanufacturing and maintenance in the following areas:

- Military markets around the world and the Defense Dept. of the United States
- Equipment for use in civil airports
- Equipment for use in military airports on land
- Equipment for use on ships
- Technology in Military Equipment

The following is just a few samples of versatility and capabilities:



Military Applications
- a. Weapons Loaders
- b. Bomb hoist
- c. Forklift trucks
- d. Maintenance trucks
- e. Munitions Trailers
- f. Maintenance stands
- g. Aircraft Jacks
- h. Buckle and Strap Assemblies
- i. Tow tractors
- j. Missile Adapters
- k. Fuel tank handlers
- l. Cylinders
- m. Valves
- n. Wheels, Brakes
- o. Towbars
- p. Engine Adapters
- q. Rocket Storage and Warhead Stands
- r. Zero Maintenance package development for Military Trailers.

Our customer service oriented team, along with our engineering design and reverse engineering capabilities has made DeVal stand out in the fleet as the optimum source for support. Our past and present performance has established DeVal as the sole source supplier of approximately 45 families of legacy Aircraft Support Equipment. These families encompass various types of fuel and Electronic Transporter Adapters, Bomb Hoists, Munitions Trailers, Dollies, Maintenance Platforms, Cargo Loaders, Drawbars, Tow Bars, Self Propelled Weapons Loaders, etc. Some of these units have as many as 3000 parts on each different unit. We have also negotiated several Long Term BOA Contracts (Basic Ordering Agreements) for spare parts from the Defense Supply Centers. DeVal has recently received a contract for upgrading and overhauling of the SATS E Loader. DeVal Corporation is the sole manufacturer of approximately 260 of these self propelled loaders in mid 1990's. DeVal is the primary source for most of the parts required. We are the sole manufacturer of many of the items used in this very extensive complicated Self Propelled Weapons Loader.

DeVal has recently become involved with foreign military sales for several countries. This market is in the very early stages with huge potential.

DeVal Corporation owns tooling packages including all of the required Forging Dies, Casting Patterns, molds etc. and has developed specialized welding and machining fixtures for all the 65 Families of Aircraft Support Equipment that we produce. In many instances DeVal possesses and is the only source of the drawings to produce these end items and parts that are required for critical fleet movements.





DeVal Corporation feels that with our past experiences and high customer satisfaction, we offer the best value package that is on the market today. This is from the standpoint of cost, reliability, acquisition, logistic standpoint, and overall value.

Our Main office and place of manufacturing is 7341 Tulip Street, Philadelphia, PA 19136. The principals of ownership are Dominic J. Durinzi, President, and Ronald E. Penska, Vice President.

*Dominic J. Durinzi*



# High Technology Manufacturer/Remanufacturer of Armament Support Equipment for the Military and Industry



ISO9001:2008/AS9100C
Certified Q. M. System

DEV-0260

# DeVal
## Growth Through Strength

From a one-man, one-machine beginning in the middle 1930's, DeVal Corporation today is a universally recognized leader in the manufacture and remanufacture of sophisticated armament support equipment for the military, and, more recently, for industry.

### Complete Overhauls
Its 250-person work force demonstrates special expertise in the restoration to full operational capability worn-out, disabled, or obsolete armament support equipment for all attack and fighter aircraft weapons and missiles. DeVal's remanufacturing know-how also is available for application on high-performance industrial trucks and forklifts.

### Advanced Technology
Originally a high-quality manufacturer of machine parts, DeVal expanded during its early days into small assemblies, subassemblies, complete assemblies, and, by the late 1950's, was into the manufacture of complete, high-quality materials handling products.

As the company grew, it continued to build strength upon strength. More and more technically degreed personnel joined the firm. The most advanced technologies, including computerization, the installation of CNC machine tools, and utilization of the most modern welding and machining techniques, were employed.

### Competency and Pride Work Together
Skilled shop operators team with top management and technical experts in adherence to a philosophy of hands-on training and problem-solving that bring DeVal a wealth of experience and technological capability second-to none in the industry.

Outstanding competency is the benchmark for measuring the



DEV-0261

high level of DeVal employee performance. Pride in doing things right and on time is a hallmark here. That is why our employee turnover rate is so low and why our output quality is so high.

## Reliability and Accountability are No. 1

In these times of international uncertainty and the absolute need to maintain an unchallenged combat-ready defense force without excessive costs, DeVal stands as an example of reliability and accountability.

Our finished products, which invariably are "Better Than New," are delivered at a fraction of the cost of new!

The business of overhauling and rebuilding is DeVal's only business. All our knowledge, experience, skill, tools and equipment are devoted to it.

The same dedication to perfection is applied to the building or rebuilding of a single spare part as it is to remanufacturing the most sophisticated weapons mover in the nation's arsenal.

## Complete Service

Our service is complete—from engineering and design, to the production of the finished

product, to the ongoing support we provide the military everywhere in the world.

Growth through strength is a way of life at DeVal.

## DeVal—Equipped to Do It All

DeVal's continually upgraded plant and equipment typify its no-nonsense approach to the remanufacturing process.

There is no wasted space, no glaring inefficiencies, no obsolete machines or tools to slow down the work or interfere with the quality of the end product.



**Machine Shop**
Skilled machinists and welders with long experience follow detailed specifications in producing complex components for rebuilts.



**Wheelabrator**
Shot-blasting cleans metal elements, removes rust, dirt and grease on disassembled equipment, restores components to a bare metal condition.



**Engine Dynamometer**
Every rebuilt diesel or gasoline-powered engine is final tested for horsepower and torque to be sure it conforms to OEM specifications.



**CNC Machining**
Sophisticated CNC machines help minimize machining time and maximize production while adhering to high quality tolerances.



**Computer Center**
Maintains accurate control of spare parts inventory and monitors production schedules.



**Paint Booth**
Every finished vehicle receives one (1) coat of epoxy primer and two (2) coats of Mil-C-83286 polyurethane paint for long life.

3

DEV-0262



## State-of-the-Art Remanufacturing Capabilities

### Quality Rebuilt Units at a Fraction of the Cost of New

For the military, DeVal remanufactures three classifications of armament support equipment in over 50 varieties:

- Mechanical Hydraulic Self-Propelled Machines
- Mechanical-Hydraulic Machines
- Mechanical Machines

Each classification carries DeVal's TAT (Turn-Around Time) assurance: 90 days on Mechanical-Hydraulic Self-Propelled Equipment, 60 days on Mechanical-Hydraulic, and 30 days on Mechanical.

Many vehicles come to DeVal after more than 30 years of strenuous service on land or sea. Most are rust-covered, with badly worn, broken or missing components. Regardless of the condition in which equipment is received, they are completed *"Better Than New."*

Every unit that comes to DeVal is inspected and serialized. Then group cost estimates for overhaul are submitted to the procuring activity.

Each unit is completely disassembled down to the basic frame. All metal components are shot-blasted in the Wheelabrator, plated, then refinished with Mil-C-83286 polyurethane paint. Frames are stress-tested. Wheels, cylinders, valves, and other components are rebuilt and tested. All rubber compo-



DEV-0263

nents are replaced with new parts. Braking systems are re-designed if needed. Hydraulic and mechanical systems are re-engineered as required to insure top performance.

At the end, the remanufactured vehicle is inspected, calibrated, performance-tested, weight-tested and certified RFI (Ready For Issue); test reports are furnished when requested. DeVal also provides on request Integrated Logistic Support (ILS) for any unit.

The finished vehicles in each category are all of one basic configuration. That's why DeVal is familiarly regarded as the "Cloning Factory." Every remanufactured unit comes complete with technical documentation, maintenance data, tests reports, MRC's and manuals.

It stems from DeVal's concept of "Value Engineering" in which every product is actually re-engineered as needed to improve its original capabilities —many times at no cost to the Government. During the re-engineering process, DeVal works closely with all government engineering agencies.

An important part of DeVal's capabilities is in "Reverse Engineering." This capability enables DeVal to bring back to life in every detail a no-longer-manufactured part or component to a "Better-Than-New" state without the military having to "cannibalize" such items from existing equipment.



# DeVal

## DeVal—Fully Qualified in Mil Spec Categories!

DeVal is approved by the government as fully qualified in Mil Spec areas required for the manufacture or remanufacture of armament support equipment and other materials handling vehicles.

Mil-I-45208. Qualified in Quality Control Inspection Systems

Mil-W-8611. Qualified for Welding Procedures for Aircraft

Mil-T-5021. Qualified for Certified Aircraft Welders—Personnel

Mil-I-6868. Qualified for Magnetic Particle Inspection Procedures

Mil-Std 410. Qualified Certified Personnel for Non-Destructive Testing

Mil-C-83286. Qualified for Polyurethane Paint Systems

Mil-Std-45662. Qualified for Calibration Systems

Mil-I-6866. Qualified for Penetrant Inspection Procedures

Mil-Q-9858A Quality Program

DeVal Holds the Government Security Rating of "Secret"









**Gauge Lab**
(Upper left). Height gauge is used to test accuracy of parts tolerance.

**Comparator**
(Lower left). Quality Control Specialist uses Comparator to check part's conformity with drawing.

**Hellarc Welding**
(Upper right). DeVal aircraft welder uses Hellarc technique in accordance with Mil Spec W-8611.

**Magnaflux Check**
(Lower right). Magnaflux procedure tests metal part for possible flaws or hairline cracks.

DEV-0265

# ...A Highly Capable Engineering Staff

DeVal's engineering staff operates to Mil-Std 480 and Mil-Std 481. It investigates problems associated with engineering change proposals and resolves them. It interfaces with Government Agencies, makes the required changes, and test samples prior to obtaining approval.

## 20,000 Drawings on File

The staff has complete drafting capability. All original drawings are maintained in the Engineering Department where duplicates of each are produced. Currently, over 20,000 are in the active file and these are regularly updated.

## Computer Printouts Readily Available

DeVal maintains a file of all technical manuals, publications and Support Equipment Changes (SEC'S). In addition, a complete printout of all drawings for each end unit including the latest revisions is readily available for inspection and review by government representatives.

## Obsolete Items Are No Problem

DeVal's Engineering Department is capable of reverse engineering any item that cannot be procured from an alternate source. DeVal engineers work with the Machine Shop and Inspection Area to produce the required item.









**gineers**
(Upper left). Engineering staff members examine drawings of designed component.

**Drafting**
(Lower left). DeVal drafting personnel checks redesign against actual original part.

**File Room**
(Upper right). Section of active file area where 20,000 drawings are kept constantly updated

**Reverse Engineering**
(Lower right). Line foreman presents obsolete part to DeVal engineer at start of reverse engineering procedure.

7

DEV-0266



# Total Support Capability

From its complete spare or repair parts service to on-the-spot technical assistance anywhere in the world, DeVal prides itself on its unbroken record of close support to the U.S. military. It not only can manufacture, overhaul or remanufacture any type of armament support equipment, but it can provide complete interchangeability, maintenance and support in a cost-effective manner. For example, it is frequently more cost-effective to purchase a complete assembly rather than a single component.

## Spare Parts Service

Every end item overhauled or remanufactured is 100% supportable.

DeVal parts inventory levels are completely computerized to minimize "out of stock."







Complete assembly being readied for shipment to installation in the field.



DeVal can supply two or more years' spare parts requirement for any rebuilt vehicle.



DeVal can supply computerized repair kits, plus necessary tooling, to help the military with field installation and parts maintenance.

This can often save installa-
tion problems in the field.
DeVal also provides exploded-
view prints to the fleet to
facilitate parts ordering.  In
addition, DeVal produces and
stocks a supply of Support
Equipment Change Kits which
can be shipped quickly to Mili-
tary Installations, afloat or
ashore, anywhere in the world.
These kits assure complete
uniformity in design and con-
figuration since they are made
with the approval of the Military
from changes which the DeVal
engineering staff has made.

## Technical Services

A computerized tele-communi-
cations network keeps DeVal
engineers and technicians in
touch 24 hours a day with ships
of the fleet wherever deployed.

Parts are delivered around the
globe virtually overnight on a
"next-flight" basis depending
on military and civilian air
schedules.







Documentation is provided for
engineering changes on all vehicles.
Logistics support is extended
through Technical Manuals, Mainte-
nance, Provisioning, and Aug-
mented Spare Parts Programs.



DeVal's "Tiger Teams" or trouble-
shooters on both East and West
Coasts stand ready to go anywhere
at any time to help solve technical
problems that may arise.

9

# DeVal

## Symbol of Reliability

Inspection and test procedures at DeVal are as rigorous and as fail-safe as advanced technology can make them.

Results speak for themselves...

Of more than 24,000 vehicles remanufactured for the military by DeVal during the past three years, only three were found to be deficient due to improper O.E.M. engineering factors. These deficiencies were quickly and thoroughly resolved by the DeVal engineering group. DeVal employs advanced Quality Control procedures at every level.

The engine Dynamometer assures that every engine will meet all field requirements. There's also an Inspection and Gauge Lab, Hydraulics Testing Lab, and a Magnetic Particle Inspection Lab.

Procedures include Rockwell Hardness Testing, Brinnel Tensile Testing, Zyglow Inspection for non-ferrous materials, Magnaflux Inspection for ferrous materials, a complete Logmar Documentation System, and a Weight Certification System.





DEV-0270



# DeVal
## Corporation

## High Technology Manufacturer and Remanufacturer of Armament Support Equipment for the Military and Industry

An Equal Opportunity Employer  7341 Tulip Street/Philadelphia, Pennsylvania 19136/(215) 332-4200

For additional information about how DeVal's capabilities can serve your specific equipment overhaul and spare parts requirements, contact the Sales Department at (215) 332-1200.

DeVal Corporation email addresses:
Main Office:     devalco1@msn.com
Sales Department:    sales@devalco.com



DEV-0271





## Ground Support Equipment Manufactured by DeVal Corporation

| Type Design | Description | Part Number | National Stock Number |
|---|---|---|---|
| A/E 32M4 | Stand Maintenance | 618900-1 | 6RX4920-01-073-8235 |
| A/F32 K1/1A | Stand Platform | 551AS100-1 | 6RX1730-00-106-7763 |
| ADK 362B | Weapon Adapter | 556AS300-1 | 6RX1740-01-104-9461 |
| ADU 399BE | Adapter | 1561AS100-1 | 2VX1430-01-201-0441 |
| ADU 400E | Lift, Weapon Skid | 787AS200-1 | 6RX1730-00-143-8788 |
| ADU 406 | Adapter | 787AS420-1 | 6RX1730-01-003-2976 |
| ADU 433A/E | Adapter 15" Height | 787AS380-3 | 1450-01-362-0348 |
| ADU 434A/E | Adapter 10" Height | 787AS380-4 | 1450-01-362-0347 |
| ADU 459 | Adapter | 1173AS100-1 | 6RX1730-01-124-7863 |
| ADU 474E | Adapter | 1246A100-120 | 6RX1730-01-154-2827 |
| ADU 475E | Adapter | 789AS920 | 1RW1730-01-088-2353 |
| ADU 483E | Adapter Skid Upper | 64A114D320-1 | 1730-01-096-5163 |
| ADU 488E | Adapter Transporter | 1257AS100-1 | 1RW4935-01-091-5969 |
| ADU496A/E | Adapter | 64A114C325 | 1730-01-282-8790 |
| ADU 497E | High Lift Adapter | 922679-101 | 6RX1730-00-930-7561 |
| ADU 511 | Adjust. Weapon Loader | 1331AS401-1 | 4920-01-202-7184 |
| ADU 514 | Sm. Missile Adapter | 1763AS700-2 | 4920-01-501-8224 |
| ADU 567 | Adapter Wing | 6SE01170-1 | 3040-01-343-2941 |
| ADU 600E | Adapter Guided Missile | 1245AS600-1 | 1730-01-463-0198 |
| ADU 628E | Insert Adpt. Wing Fin | 1700AS103 | 5970-01-391-5548 |
| ADU 732A | Collar Adapter | 3173AS115-1 | 3940-01-380-9460 |
| ADU 894 | Adapter | 3958AS100-1 | 3940-01-556-1990 |
| AERO 12C | Bomb Skid | 62A81D1 | 6RX1740-00-872-9361 |
| AERO 21C | Weapons Skid | 64A114H1-4 | 6R1740-00-148-6492 |
| AERO 33E | Trailer Lift | 63A81J2-2 | 6RX1730-00-140-4354 |
| AERO 47A | Weapon Adapter | 64A98E53 | 6RX1730-00-852-0186 |
| AERO 47A1 | Weapon Loader | 67A229J53-1 | 6RX1730-00-139-6078 |
| AERO 51B | Trailer | 67A314F100 | 6RX1740-00-133-7153 |
| AERO 51E | Trailer | 3922AS100-1 | 1740-01-533-8577 |
| AERO 58A | Front Adapter | 64A114D16-1 | 1740-00-754-4804 |
| AERO 58A | Rear Adapter | 64A114D17-1 | 1740-00-675-6031 |
| AERO 61B | Hoisting Beam | 65A101 | 1730-00-977-7346 |
| AERO 64A | Soft Belt | 1567575 | 1730-00-948-3532 |
| AERO 67A1T | Adapter | 66A79J2-1 | 1RW1730-00-123-8320 |
| AERO 67AT | Adapter | 66A79J2-2 | 1RW1730-00-123-8334 |
| AERO 67AL | Loader Assy | 66A79J3-1 | 1RW1730-00-123-8335 |
| AERO 67AO | Outrigger Assy | 66A79J4-1 | 1RW1730-00-123-8315 |
| AERO 71A | Adapter Weapon | 2483105 | 6RX1740-00-943-7946 |
| AERO 74A | Adapter Assy | 67A311J2-1 | 6RX1730-00-087-5684 |
| AERO 75A | Spacer Center | 67A311D3-1 | 6RX1730-00-087-5681 |
| AERO 83A | Adapter | 2483108 | 1RW1730-00-966-5891 |
| AERO 87A | Wall Eye Adapter | 66A82F3 | 1730-00-937-2805 |
| AERO 91A | Adapter | 616271-1 | 6RW1730-00-151-4113 |
| AERO 9C | Bomb Skid | 60A81-1 | 1RW1720-00-719-9516 |
| AM32 K4A | Trailer | 67A219J1 | 6RX2330-00-431-3826 |
| AM 32U13A | Trailer | 1541AS100-1 | 2VX1740-01-191-5538 |
| AM 32U13B | Trailer, Armament | 1541AS100-2 | 2VX1740-01-275-5899 |
| AS32K1D | Weapons Loader | 1378AS100-1 | 2VX1730-01-199-4671 |
| AS32K1E | Weapons Loader | 3772AS100-1 | 1730-01-505-3956 |





| Type Design | Description | Part Number | National Stock Number |
|---|---|---|---|
| B1 | Maint. Platform | 47R16420 | 1730-00-390-5618 |
| B4A | Maint. Platform | 54J6345 | 1730-00-294-8883 |
| B5 | Maint. Platform | 54J6279 | 1730-00-294-8884 |
| Buckle/Strap | Buckle/Strap Assy | 64A114H300-1 | 1740-00-754-4807 |
| Buckle/Strap | Strap Assy | 64A114H300-2 | 1740-00-072-4644 |
| Buckle/Strap | Buckle/Strap Assy | 64A114H300-3 | 1740-00-060-6816 |
| Buckle/Strap | Buckle/Strap Assy | 64A114H300-6 | 1730-01-113-4382 |
| HLK 225A | Trolly Monorail | 616190-2L | 3950-01-148-1385 |
| HLK 226A | Trolly Monorail | 616190-2R | 3950-01-148-1384 |
| HLU 288E | Bomb Hoist | 1353AS100-1 | 6RX1730-01-161-8623 |
| HLK355 | Adapter Hoist | 3223AS100-1 | 3940-01-406-3440 |
| HLK356 | Adapter Hoist | 3223AS100-2 | 3940-01-406-3439 |
| HLK275A | Band Hoist | 65A101H48-1 | 1730-01-360-3842 |
| HLK276A/32K5 | Band Hoist Lg. Lt. GA | 65A101D1-2 | 1730-01-141-2280 |
| HLK276A/F32K5 | Band Hoist Hvy. Ga. | 65A101H47-1 | 1730-01-309-3815 |
| HLK277/F32K5 | Band Hoist Hvy GA. | 65A101D2-2 | 1730-01-141-2282 |
| HLK278/F32K5 | Latch Assy. | 65A101D3-1 | 1730-01-141-2281 |
| HLK279/F32K5 | Fitting Assy. | 534AS100-1 | 1730-01-141-2284 |
| GSU284E | Tool Brake Assy. | 6SE00863-1 | 5120-01-075-5919 |
| MHK 128 Drawbar | Drawbar Short Weap.Skid | 64A114H282-2 | 1740-00-026-9911 |
| MHK 128M32K5V | Munitions Trailer | 556AS100-1 | 6RX1740-01-003-0845 |
| MHU125 A/E | Skid Platform | 1330AS100-1 | 3990-01-075-5919 |
| MHU 126A/M | Trailer | 804AS100-5 | 6RX1740-01-062-5188 |
| MHU126 Drawbar | Drawbar assy | 804AS171-1 | 1740-01-463-2082 |
| MHU 151M | Trailer | 1193AS100-1 | 6RX1740-01-090-2084 |
| MHU 171A/E | Trailer | 1223AS100-3 | 1740-01-241-5015 |
| MHU 171E | Trailer | 1223AS100-1 | 6RX1740-01-148-1438 |
| MHU 185M | Trailer | 1318AS10-1 | 6RX1740-01-126-8980 |
| MHU 191M | Munitions Trailer | 1500AS100-1 | 6RD1740-01-244-3449 |
| MHU191 Drawbar | Drawbar assy | 1500AS200-1 | 1740-01-282-6437 |
| MHU 202 | Trailer | 1905AS100-1 | 1740-01-379-0754 |
| MHU 63E | Cradle | 2560340 | 6RX1450-00-151-4115 |
| MHU 65E | Cradle Assy | 2560341 | 6RX1450-00-151-4117 |
| MHU 229 | Skid Platform | 3967AS100-1 | 3990-01-563-3121 |
| MK7 MOD 3 | Bomb Lift Trailer | 67A247J1 | 6RX1730-00-256-6550 |
| MK7 MOD 4 | Bomb Lift Trailer | 67A248J1 | 6RX1730-00-256-6551 |
| MK7 Outrigger | Outrigger Assy | 924995-101 | 1730-00-827-2172 |
| MK 137 | Adapter | 5166321 | 7HH1730-01-062-4149 |
| MK 24 | Dolly | 5166020 | 7HE1398-01-054-8147 |
| MK 45 MOD 2 | Hand Lift Truck | 5167104 | 3920-01-152-7179 |
| MK51/1 | Carrier Weapons | 651AS100-1 | 1398-00-190-5719 |
| MSU 164 | Guided Missile | 787AS800-1 | 1450-01-029-1634 |
| M817 AMMO BOX | Ammo Box | 8758436-1 | 2640-01-108-929 |
| Navy | Stabilizer Assy | 3573AS290-1 | 6230-01-476-1825 |
| Navy | Firewand | 3449AS200-1 | |
| Air Force | Ground Adapter | 68D390006-1005 | 1730-01-390-3579 |
| Navy | Center Mechanism | 4B1000D-10 | 1730-01-246-9918 |
| Navy | Tray Assy | 551AS103 | 1730-00-106-7762 |

DEV-0273





| Type Design | Description | Part Number | National Stock Number |
|---|---|---|---|
| Air Force | Rocket Storage Stand | X20015505 | |
| Air Force | Rocket Warhead Stand | X20065001 | |
| Northrop Grumman | Hoist Adapter L/H | 74D750006-1001 | 1730-01-098-5253 |
| Northrop Grumman | Hoist Adapter R/H | 74D750006-1002 | 1730-01-098-5254 |
| Northrop Grumman | Trolley | 74D750004-1001 | 1730-01-059-2802 |
| BIW & Austal | Munitions Transporter | DVMTLCS100-1 | 1740-01-596-3809 |
| C.E.I. | Rail Cart | 8G208-103 | Deveopmental |







AIRCRAFT ARMAMENT WEAPON SUPPORT EQUIPMENT   SINCE 1954

7341 Tulip Street/Philadelphia, Pennsylvania 19136 • 215•332•1200 • Fax 215-332-0470

## DE VAL CORPORATION    MANUFACTURING EQUIPMENT INVENTORY

| QTY. | MANUFACTURER | DESCRIPTION |
|---|---|---|
| 1 | Haas | ST-30 CNC Lathe with chip conveyor, parts catcher and presetter |
| 1 | Haas | Bar Feeder Bar 3010 ST |
| 1 | Haas | 46020 Royal Quick Grip Collect Chuck System |
| 1 | Haas | Maza Cad/Cam Software |
| 1 | Haas | Machining Center VF-9/40  S/N 1097148  Mfg. date 8/23/12 |
| 1 | Miller | 2012 Robot & Miller Auto Axis Welder 1100SS W/TA1900 S/N J1216 Mfg. 7/12 |
| 1 | Haas | CNC Haas Vertical Machining Centers Model VFS3 |
| 1 | Haas | CNC Haas Vertical Machining Centers Model VF4SS |
| 1 | Haas | VF-3 Vertical Maching Center with side mount tool changer, chip conveyor, P Cool-O |
| 1 | Haas | VF-4, Super Speed Vertical Maching Center, HSM High Speed, Expanded Memory, |
| 1 | Mazak | Mazak 250 CNC Lathe, Quick Turn Nexus, Side Discharge Chip Conveyer, Auto |
| 1 | Mazak | Vertical Center Nexus 510C-II, Conveyor & Catcher |
| 1 | Mazak | Quick turn Nexus 250 Model QTN250 |
| 1 | Pratt & Whitney | #2A Jig Borer S/N 1028 w/digital readout |
| 1 | Pratt & Whitney | #2A Jig Borer, s/n 627 w/digital readout |
| 1 | Pratt & Whitney | #2A Jig Borer, s/n 730 (1945) |
| 1 | Pratt & Whitney | #2A Jig Borer digital readout, s/n 995 (1946)variable sp dr |
| 1 | Webb | Vertical Milling Machine, s/n 800194-1980 |
| 1 | Gould & Eberhardt | Shaper, 24" Industrial, s/n 3360A3 var.speed hd dig.readout w/vice |
| 1 | Bridgeport | Milling Machine, 42" Table - s/n 116734 |
| 1 | Bridgeport | Milling Machine D/R, s/n 178742 var sp head dig readout & power table feed |
| 1 | Warner & Swasey | #4 Universal Turret Lathe s/n 1582650 Model M-1420 |
| 1 | Warner & Swasey | #2 Turret Lathe, s/n 523932 |
| 1 | Jones & Lamson | #5 Turret Lathe, s/n 5568 |
| 1 | Jones & Lamson | #5 Turret Lathe |
| 1 | Warner & Swasey | #2A Turret Lathe, s/n 570236 |
| 1 | Cincinnati | Hypowermatic 50 HP Duplex Prodution Milling Machine - 72" Travel |
| 1 | Cincinnati | Production Milling Machine s/n 1BZPIL-648 |
| 1 | Cincinnati | Production Milling Machine s/n 2Z1P1J490 |
| 1 | Cincinnati | Production Milling Machine 16/78  4091 |
| 1 | Bridgeport | Milling Machine s/n 157526 - Dig Readout w/Power Table Feed |
| 1 | Allen Company | 2-Spindle Drill Press, s/n 20498A |
| 1 | Leland-Gifford | 4-Spindle Drill Press, s/n 3977 |
| 1 | Fosdick | 1-Spindle Drill Press |
| 1 | Clausing | Drill Press, s/n 110257 - 24" |
| 1 | Allen | 2-Spindle Drill Press s/n MS268026 |
| 2 | Clearman | Drill Press S/N 2DIC5E-36, s/n Unknown |
| 1 | HMT | Engine Lathe, NH 22, 16"x78" |
| 1 | Pratt & Whitney | Vertical Milling Machine, Model 1811, s/n 137 |
| 1 | Scotchman CPO 350 | Cold Saw w/vise Variable spped with 10" roller conveyer |
| 1 | Do-All | Contour-Matic 16" Band Saw Vertical, s/n 5619390 |
| 1 | Zagar | Broach Vicker Mod. F24-202-A |
| 1 | Marvel | Hacksaw S/N 67362 w/roller table |
| 1 | Clausing | Engine Lathe No. 3 S/N 320406H |
| 1 | Baldor | Double end grinder |
| 1 | Troyke | Rotary table 15" dia. /5C index horizontal & vertical |
| 1 | Pratt & Whitney | Precision rotary table, horizontal & vertical |

DEV-0275

## DE VAL CORPORATION — MANUFACTURING EQUIPMENT INVENTORY

| QTY. | MANUFACTURER | DESCRIPTION |
|---|---|---|
| 1 | Yuasa | 8" index super spacer with chuck |
| 1 | | Rivet Machine, s/n H401642 |
| 1 | Clamco | Heat Seal Machine, Model #238A - 2 piece |
| 1 | Doall | Horiz Band Saw w/fully auto. Table s/n 56-631091 |
| 1 | | Broaching Arbor Press with Table |
| 1 | | No 5 Arbor Press with Table |
| 1 | | Tubing Cutter with Table and Dayton Motor |
| 1 | Porter-Cable | Chop Saw s/n O18258 |
| 1 | | High Pressure Hyd Testing Machine with Motor and Pump |
| 2 | Huck | Rivet Gun Model# 226C210 s/n 1724 & s/n 1438 |
| 1 | Grizzly | Engine Lathe 13"/40" Model G9731 - (2) 3 & 4 Jaw Chucks 2004 |
| 212 | Milling Cutters, Co. | Various Cutters for Milling Machine (212 pieces) |
| 3 | Sunnen | Honing Machines MBB-12900, s/n 17333, 511, 97, unknown |
| 1 Lot | Sunnen | Small & Large Honing Tanks, Honing Tools and Stones |
| 3 | True-Trace | Hydraulic Machine Attachments |
| 1 | Chevalier | Speed  s/n BM93N302 |
| 1 | Cincinnati | Monoset Cutting Grinder s/n 2D1C5E-36 |
| 1 | Pratt & Whitney | 20" rotary table M0A1278 |
| 1 | | 4 Jaw chuck, 3 Jaw chuck, 2 Jaw chuck - 12" |
| 1 | | Double wheel ginder, Cart 2'x4' with lathe tooling, table with lathe tooling |
| 2 | | Steel table 5'x2' with steel rack |
| 1 | Leblond | E14"N60" Engine Lather-Regal w/dig. Read out S/N 11C551 |
| 1 | Famco | Arbor Press #6 |
| 1 | Craftsman | Single Spindle Drill Press = 1/4" |
| 1 | Minster | #6 Press, O.B.I., - 60 Ton - s/n 6-13984 |
| 1 | Cincinnati | 10' Press Brake, 3" Str, Hydraulic, 250 ton - s/n 21953 |
| 1 | Niagara | OBI/FW Punch Press, 3" Str, 60 ton -  s/n 17420 |
| 1 | Cincinnati | 10' Shear, Cap. 1/4" Mild Steel, s/n 21318 |
| 1 | Blanchard | #18 Blanchard Grinder, 42" Table s/n 9151 |
| 1 | Do-All | Vertical Band Saw s/n 3641498 |
| 1 | Lucas/Universal | Horiz. Boring Mach 4" Dia Sp.,56"x30" Table, s/n 13-32 |
| 1 | Stone | 12" Radial Saw S/N O413 |
| 1 | Brown & Sharp | 5"x10" Surface Grinder, s/n 8959 |
| 1 | Airco | D.C. Bumble Bee Single RangeType, Welding Machine s/n H 139127 |
| 1 | Airco | Model #2DDRS-24-B, s/n H139124 |
| 1 | Airco | Welder, Model # 2.5DTR-224-A, s/n P356565 |
| 1 | Airco | Model # MH-204002, 300A, A/C |
| 1 | Airco | D.C. Bumble Bee Single Range Type, s/n H 139124 |
| 1 | Miller | Constant Potential D.C. Welder s/n P355994 |
| 1 | Miller | Constant Potential D.C. Welder s/n P358878 |
| 1 | Miller | Welder s/n JG065952, Model - Dialarc |
| 1 | Miller | Welder, Model #CP250TS, s/n P355994 |

DEV-0276

## DE VAL CORPORATION          MANUFACTURING EQUIPMENT INVENTORY

| QTY. | MANUFACTURER | DESCRIPTION |
|---|---|---|
| 1 | Miller | R-115 Wire Feeder, s/n LJ020897U with Steel roller stand |
| 1 | Miller | Arc Welder, Model # SRH-222, s/n HH003540 |
| 1 | Miller | Welder - Model # JE-746460, TIG |
| 3 | Lincoln | (3) Electric TIG Water Cooler |
| 1 | Lincoln | Precision Tig 275 |
| 1 | Lincoln | Arc Welder s/n AC645252, Model # 250/251 |
| 1 | Int'l Welding Tech | Portable Welder, Model LYNX |
| 1 | Electro Arc | Metal Desinagrater Mod. LBH S/N 7672 - Spot Welder |
| 1 | Taylor WIN Field | Spotwelder S/N 17-057 |
| 1 | Ransome | Welding Positioner, s/n 998 - 36" |
| 1 | Ransome | Welding Positioner, s/n 761 - 36" |
| 2 | Ingersoll | Welding Tables 3' x 13' |
| 2 | Purox | Acetylene Torch Units w/Carts |
| 1 | Ingersoll | Planer/Milling Machine, 10" Travel - s/n 2379 |
| 1 | Porter Cable | Wet-Dry Belt Grinder s/n 7249 |
| 1 | Almco | Tumbler Machine |
| 1 | Interpac | Shop Press |
| 1 | Ingersoll | 25 HP Air Compressor s/n 30T55428, Model # 25T2 |
| 1 | Trinco | Blaster, s/n 56806-2, Model # 48 x 36/DP 850 |
| 1 | K.H. Huppert | Furnace, Digital Read Out, Chamber 36"x72" - s/n 101 |
| 1 | Dresser | 25 HP Air Compressor, s/n 4020X704 |
| 1 | HYD | Die Table, 30" x 30" |
| 1 | Pipe Threader | Model # 22A, s/n 11116, Cap 1" |
| 1 | Challenge Machinery | Layout Table 36 x 60 x 6 |
| 1 | Chicago Brake Co. | Bending Brake - 4 ft |
| 4 | Phoenix | Electrode Stabilizing Ovens, Type 300, Model # 16C |
| 1 | Chicago Co. | Arbor Press No. 3 |
| 1 | Dayton | 1" Belt Sander |
| 1 | Ammco | Brake Shoe Grinder, s/n 3113 |
| 1 | Bullard | 24" Vertical Turret Lathe (fine feed) 3 Jaws, s/n 14445 |
| 1 | Westinghouse | 15 HP Air Compressor, Model #430P |
| 1 | Spray Tech | Portable Paint Sprayer, Model # 1620 |
| 1 | Schmidt | Name Plate Press, Model # 4 |
| 1 | Enerpac | Hush-Pup, Model AB20, Pipe Spreader w/ Pump 392 & Cyclinders (3) |
| 1 | Enerpac | Elec Flairing & Criming Press, s/n 805185, Call O Crimp |
| 1 | | 5" sheet metal roller S/N J1122 |
| 1 | | 20" sheet metal roller |
| 1 | Milwaukee | 1/2 Drill Press w/magnetic base S/N 21145 |
| 1 Lot | | layout table 3'x4', Steel Welding table 3'x5' |
| 1 Lot | | lg., Steel table 3'x5', 3'x4' steel table, Layout table small 14"x18", 20 ton hydraulic jack |
| 1 | Clausing | 1/2 Drill Press, s/n 110679, 3 Phase |
| 1 | Handi-Kleen | Parts Washer |

DEV-0277

## DE VAL CORPORATION          MANUFACTURING EQUIPMENT INVENTORY

| QTY. | MANUFACTURER | DESCRIPTION |
|---|---|---|
| 1 | Binks | Spray Booth - S |
| 1 | Ransburg | Electrostatic Paint Sprayer - 2008, Model #9050 Cascade |
| 1 | Binks | Spray Booth 20' x 10' |
| 1 | Central | Paint Shaker No. 422 |
| 1 | Kitagawa | NC Rotary Table MR200 |
| 1 | Oil Gear Co. | Broach Machine |
| 1 | DeWalt | Chop Saw, s/n 32697 |
| 1 | Fanco | No 3 Arbor Press |
| 6 | Kurt | Precision Vices - 6" |
| 1 | Burr-King | 2x48 Model #960 s/n 10570 |
| 1 | Komatsu | Electric Forklift, 3500 lb, s/n 060268A, Model # FB-185H-5 |
| 1 | Hyster | Fork Lift, 5000 lb, Model # Space Saver 50, Triple Mast |
| 1 | Komatsu | Elec Fork Truck, FG455, s/n 95050 - Capacity - |
| 1 | Lesson | Hydraulic Truck Lift, Model # M6K34NB7A |
| 1 | Burr-King | Sander, Model # 760 2x48" |
| 1 | High Speed Hammer Co. | Riveter, s/n A8-026 |
| 1 | Enco | 1/2" Bench Drill Press, Model # 40050, s/n B-5-61390 |
| 1 | Zero | Sandblast Machine, 36 x 48, s/n 29356 |
| 1 | Pennsylvania Co. | Engine Lift Stand, 94-36943 |
| 1 | Saylor-Beall | Air Compressor, 10HP, Model # 705 s/n 5-277 |
| 1 | Dayton | 1" Belt Sander |
| 1 | Craftsman | 1" Bench Grinder, Model # 397.19590 |
| 1 | Dayton | Polisher, Model # 42125A |
| 1 | Coleman | 3000 Watt Generator, Model # PM0523001 |
| 3 | Dayton | Belt Sanders |
| 1 | Leland Gifford | High Speed Drill Press Model # 2, s/n 30777 |
| 1 | Black & Decker | Hilti DX72-Jet Sweat #6100 Sander |
| 1 | Craftsman | Router - 1-3/4 JP |
| | | Huck Gun Mod 226 |
| 2 | | Air Impact guns 1 3/4 drive and 1/2 drive |
| | | Chucking reamers, Carbide Cut Off Tools, Cobalt Spiral Taps, Carbide Inserts |
| | | Boring Bars, Shank and Steel Milling Arbors, Dies, Jigs, Fixtures, Molds |
| 1 | | 1 X 42 Belt sander and disc - Old |

DEV-0278

## DEVAL CORPORATION                    INSPECTION EQUIPMENT

| QTY. | MANUFACTURER | DESCRIPTION |
|---|---|---|
| 1 | CMM Machine | Model BH710 S/N N9120011-0101033102 |
| 1 | Faro | Faro Arm Edge 14000-002 S/N E09-05-12-10114 Mfg. date 5/23/12 |
| 1 | Zyglo Equipment | Cleaning Tank, Penetrant Tank, Powder Tank, Zyglo Reading Booth |
|   | DeVal Corporation | Rinse Tank |
| 1 | Magnaflux | Magnetic Particle Insp Eq s/591022 |
| 1 | Magnaflux | Demagnetizer s/n 59343 |
| 1 | Heidenhain | 242 Height Gauge |
| 1 | American Gauge Company | Between Centers Checker |
| 1 | Mitutoyo Digital Gauge | Digital readout inspection gauge 24" |
| 1 | Pratt & Whitney | Super Micrometer |
| 2 | King Tester Corp | King Portable Brinells |
| 2 | Surface Plate | Granite - 3' x 2' x 4" |
| 1 | Surface Plae | Granite - 3' x 6 ft. |
| 2 | Rockwell | Hardness Tester, s/n 3JR338, s/n 3R2181 |
| 1 Lot |   | Calibration Tools, Testing Equipment, and Misc. Lab Equipment |
| Various Qty |   | Intra Micrometers Ranging from .25 - 4.00 Diameter |
| Various Qty |   | O.D. Mlocrometers Ranging from .00 - 16.000 |
| Various Qty |   | I.D. Micrometers Ranging from .000 - 20.000 |
| Various Qty |   | Vernier Calipers 0" - 6" |
| 2 |   | Vernier Calipers 0" - 24" |
| 1 |   | Vernier Caliper 0" - 48" |
| 2 |   | Digital height gauges 0" - 24" high |
| 2 |   | Dial Bore gauges ranging from 050 - 6.000 |
| Various Qty |   | Gauge Blocks Ranging in size from 050 - 1.00 |
| Various Qty |   | Gauge Pins Ranging in size from .030 - .500 |
| Various Qty |   | Micrometer Standards Ranging in size from 1.000 - 16.000 |
| Various Qty |   | I.D. Micrometer Standards ranging in size from .25 - 4.000 |
| Various Qty |   | Thread Wire standards for all thread ptiches |
| Various Qty |   | Thread Ring gauges ranging from 4 - 40NF - 5-/34 - 12 NF |
| Various Qty |   | Thread Plug Gauges Ranging from 4-40NF - 5-3/4 - 12 NF |
| Various Qty |   | Thread set-plug gauges ranging from 4-40NF - #3" -16 NF |
| 1 | Pratt & Whitney | Super Micrometer 0-12" |
| 1 |   | Torque Wrench up to 150 Ft Pounds |
| 2 |   | 0-25 Ft Pound Torque Wrenches |
| 1 |   | 0-400 Inch pound Torque Wrench |
| 1 |   | 0-5000 Pound Dynamometer |
| 1 | Microview | Optical Comparator Model # 600 s/n 2120 |
| 1 |   | Asst Checking Instruments Jobe Blocks |
| 1 | Challenge Machinery | Lay-out Table, 4' x 12' 6" |
|   |   | Measure Meter Wheel |

DEV-0279

Inspection Department's CMM Machine
Model BH710



Inspection Department's FARO Arm Edge
Model 14000-002



MAZAK Vertical Center



MAZAK 250 CNC Lath



HAAS VF-3 Vertical Center



HAAS VF 4SS Vertical Center



HAAS VF 9/40 Machine Center



HAAS VF-4 Vertical Center



HAAS Bar Feeder 3010 ST



HAAS ST 30 CNC Lathe



Robot & Miller Auto Axis Welder



DeVal Corporation, 7341 Tulip St., Philadelphia, PA 19136 (215) 332-1200

DEV-0281