*Appellant Designation - 12/25/18*
*Transmission - 1/8/19*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : |
| | :   Chapter 11 |
| DeVal Corporation, | : |
| | :   Case No. 16-17922 (AMC) |
| Debtor. | : |
| | : |

## NOTICE OF CROSS APPEAL

PDI/DeVal Acquisition, LLC ( "PDI"), by and through its undersigned counsel, hereby respectfully files this cross-appeal under 28 U.S.C. § 158(a) from the Order and Opinion Granting the Application of PDI for Administrative Expenses pursuant to 11 U.S.C. § 503(b), dated November, 2018 [Dkt. Nos. 254 and 255] (the "Order and Opinion"), to the extent that such Order and Opinion reduced PDI's original request for an administrative expense in the amount of $181,435.98 as a result of the precedent set forth in the opinion of the Third Circuit Court of Appeals in *LeBron v. Mechem Financial Inc.*, 27 F.3d 937 (3d Cir. 1994).

The names of all parties to the Order appealed from and the names addresses and telephone numbers of their respective attorneys (if applicable) are as follows:

**DeVal Corporation**
Robert M. Greenbaum
David B. Smith
Smith Kane
112 Moores Road, Suite 300
Malvern, PA 19355
(610) 407-7215

**Parts Life Inc.**
John P. Leon
Willow Ridge Executive Office Park
750 Route 73 South - Suite 307B
Marlton, New Jersey 08053
856-985-3086

120668239_1

Date:  December 11, 2018

DILWORTH PAXSON LLP

/s/ James M. Matour
James M. Matour
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
P: (215) 575-7000
F: (215) 575-7200

*Counsel for PDI*

12/12/18

Cc:

Judge Chan
U.S. Trustee - Kevin Callahan
Debtor - Deval Corp
John P. Leon - Parts Life Inc.
James Matour - PDI Deval / Appellant Cross Appeal
Robert Greenbaum - Debtor Attorney
David B. Smith - Debtor Attorney
District Court.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | **Chapter 11** |
| | : | |
| **DEVAL CORPORATION,** | : | |
| | : | **Bankruptcy No. 16-17922-AMC** |
| **DEBTOR** | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

**ORDER**

AND NOW, this 15th day of November, 2018, upon consideration of the Application for Administrative Expenses Pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code ("Application") filed by PDI Deval Acquisition, LLC ("PDI"), the Brief in Opposition filed by Parts Life, Inc. ("Parts Life"), PDI and Parts Life's Stipulation of Facts, and the related pleadings filed thereto, and after hearings on August 1, 2018 and September 26, 2018, for the reasons stated in the accompanying opinion, it is hereby ORDERED that:

1. The Application is GRANTED IN PART;

2. PDI is allowed an administrative expense claim pursuant to 11 U.S.C. § 503(b)(3)(D) in the amount of $8,224.71;

3. PDI is allowed an administrative expense claim pursuant to 11 U.S.C. § 503(b)(4) in the amount of $75,469.01; and

4. The Reorganized Debtor shall pay, or cause to be paid, PDI's full allowed administrative expense claim in the amount of $83,693.72 in accordance with the confirmed Chapter 11 Plan of Reorganization.

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | **Chapter 11** |
| | : | |
| **DEVAL CORPORATION,** | : | |
| | : | **Bankruptcy No. 16-17922-AMC** |
| **DEBTOR** | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

### I.    INTRODUCTION

PDI Deval Acquisition, LLC ("PDI") filed an Application for Administrative Expenses Pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code ("Application") in the above-captioned bankruptcy case of Deval Corporation ("Debtor") seeking reimbursement for certain actions taken by PDI which substantially contributed to the Debtor's estate. The Court finds that PDI's extensive and costly participation substantially contributed to the Debtor's case by accelerating the sale process in the face of the Debtor's inaction, preventing the estate from becoming administratively insolvent and preserving the value of the Debtor for the unsecured creditors. PDI is, therefore, entitled to an administrative expense award in the amount of $83,693.72.

### II.    FACTUAL/PROCEDURAL BACKGROUND

The Debtor is a high-tech manufacturer of aircraft and weapon support equipment for the United States military. Mot. to Extend ¶ 2. On November 4, 2010, the Debtor entered into an asset purchase agreement ("Asset Purchase Agreement") with PDI to sell substantially all of its assets to PDI. Stip. ¶ 3. On February 8, 2011, the Debtor also entered into a management agreement ("Management Agreement") with PDI whereby PDI would manage the Debtor's

1

business pending the closing of the Asset Purchase Agreement. *Id.* at ¶ 4. Ultimately, PDI was

unable to obtain the necessary financing to purchase the Debtor's assets and the Asset Purchase

Agreement was never consummated. *Id.* at ¶ 3. During PDI's management of the Debtor,

however, PDI advanced a total of $2,011,861.12 to the Debtor for operating expenses. *Id.* at ¶ 6.

The Debtor ultimately repaid $1,391,500, leaving an unpaid balance of approximately $620,000

to PDI. *Id.*

PDI subsequently obtained a judgment ("Judgment") against the Debtor in an Ohio state

court in the amount of $982,933.36 plus interest at 18% per annum. *Id.* at ¶ 8. PDI domesticated

the Judgment in Pennsylvania and, in the early fall of 2016, executed on the Judgment. *Id.* at ¶ 9;

App. for Admin. Exp. ("App.") ¶ 6. As a result, BB&T Bank ("BB&T"), the Debtor's senior

secured creditor, froze the Debtor's borrowings, swept the Debtor's cash, and failed to honor the

Debtor's payroll checks. Stip. ¶ 10. On September 2, 2016, PDI forwarded a term sheet to the

Debtor proposing that PDI acquire the Debtor's personal property through a sale in bankruptcy

conducted pursuant to section 363 of the Bankruptcy Code ("363 Sale") for a purchase price of

$750,000, subject to higher bids. *Id.* at ¶ 14.

On November 11, 2016, the Debtor filed for protection under chapter 11 of the

Bankruptcy Code. *Id.* at ¶ 17. In January 2017, PDI delivered a revised term sheet to the Debtor

proposing that PDI acquire the Debtor's personal property in exchange for a $675,000 payment

to BB&T, a $25,000 cash payment to the Debtor, and forgiveness of the PDI debt. *Id.* at ¶ 15.

PDI's proposed transaction would have left the Debtor with equity in its real estate and the right

to recover on certain causes of action as potential sources of payment for the Debtor's unsecured

creditors. Aug. 1, 2018 Hrg. Tr. ("Tr.") 31:12 – 32:1. Most of the business terms in the term

Case 16-17922-amc    Doc 254    Filed 11/15/18    Entered 11/15/18 13:26:38    Desc Main
Document    Page 3 of 23

sheet were fully negotiated, but the Debtor failed to take any action to finalize the deal with PDI

for two months. Obj. to Exclusivity ("Obj.") ¶ 17.

On March 9, 2017, the eve of the expiration of the exclusivity period, the Debtor filed a

Motion to Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement

("Motion to Extend"). ECF No. ("ECF") 69; App. ¶ 10. In the Motion to Extend, the Debtor

stated that it had been negotiating with an interested party (presumably not PDI) at the outset of

the bankruptcy filing, but such party was not comfortable purchasing the Debtor through a 363

Sale. Mot. to Extend ¶¶ 3-4. The Debtor stated, however, that it had "significantly advanced its

efforts to sell certain of its business assets and for debtor-in-possession funding to facilitate its

operations through the sale process." *Id.* at ¶ 5.

Before responding to the Motion to Extend, PDI's principal, Irwin Haber ("Mr. Haber"),

met with PDI's chief financial officer, general counsel, and bankruptcy counsel to discuss how to

proceed and learned about the possibility of obtaining reimbursement of PDI's legal fees and

expenses under section 503(b). Tr. 34:10-21; 35:14 – 36:6. Ultimately, Mr. Haber decided that

PDI would take a more aggressive approach in the case based upon the prospect of receiving

reimbursement for performing services which substantially contributed to the estate pursuant to

sections 503(b)(3)(D) and 503(b)(4). *Id.* at 34:7 – 36:6.

Accordingly, on March 17, 2017, PDI filed an Objection to Extension of Exclusivity,

Cross-Motion for the Appointment of a Chapter 11 Trustee and Request for Expedited Hearing

("Objection") and attached a draft plan which it intended to file upon termination of the

exclusivity period. ECF 77; Stip. ¶ 19. In its Objection, PDI stated that the Debtor was

administratively insolvent and on the verge of collapse. Obj. 1. PDI's concerns were based, in

3

part, on the decision of the Debtor's shareholders to defer one or more paychecks and on recent

reductions in compensation taken by the Debtor's shareholders and its 29 employees. *Id.* at ¶ 5.

PDI also had significant concerns about the drop in the Debtor's normalized annual sales

from $8 million, a level where the Debtor was marginally profitable, to $5.4 million in 2016 and

less than $3 million in 2017. *Id.* at ¶ 6. PDI further represented that the Debtor had insufficient

cash to buy the requisite inventory needed to commence production for two large Navy contracts

and that the contracts, on average, accounted for 50% of the Debtor's normalized sales volume.

*Id.* at ¶ 7. As a result, the Debtor had "delivered minimal, if any, production units to date," which

had stalled the contracts and caused the Navy to classify the contracts as delinquent. *Id.*

Moreover, the uncertainty surrounding the Debtor's future had prompted the resignation of two

highly experienced, skilled machinists in February. *Id.* at ¶ 8.

Based upon the Debtor's January monthly operating report, which reflected that the

Debtor had accounts receivable of $241,000 and post-petition liabilities in excess of $600,000,

PDI concluded that the Debtor was administratively insolvent. *Id.* at ¶ 10. PDI further

represented that, although the Debtor had been actively looking for a buyer since August of

2016, the Debtor had yet to find one. *Id.* at ¶ 11. The Debtor also urgently needed debtor-in-

possession financing but had no prospects in sight. *Id.* In light of the foregoing, PDI believed that

the Debtor was strapped for cash and on the brink of financial collapse. *Id.* at ¶¶ 11-12. It

appeared to PDI that the only way to salvage the situation was to terminate the exclusivity period

so that PDI could file a plan of reorganization which would reorganize the Debtor as a going

concern. *Id.* at ¶ 13.

PDI also argued that the Debtor's gross mismanagement in allowing the Debtor's case to

languish warranted the appointment of a chapter 11 trustee. *Id.* at ¶ 26. PDI found the

4

appointment of a chapter 11 trustee necessary to prevent the Debtor's shareholders from driving the business into liquidation and to advance the best interests of the Debtor's estate. *Id.* at ¶¶ 26, 29.

In connection with the Objection, PDI sought certain discovery, including "[a]ll agreements, term sheets, memoranda of understanding, or other documents reflecting any agreements or potential agreements with any party who, at this time, remains a viable potential purchaser or lender to the Debtor's business." Stip. ¶ 20. Although the Debtor objected to this document request, the Court overruled the Debtor's objection and the Debtor complied with PDI's production request on March 31, 2017. *Id.*

The Debtor's production turned out to be woefully inadequate. The Debtor only submitted two written proposals from potential buyers to acquire the Debtor's business – one was almost a year old and the other was eight months old. *See* Stip. Ex. A. No further interest had been shown by either potential buyer. The Debtor had also exchanged emails with a few other potential buyers, including one of its customers, Parts Life, Inc. ("Parts Life"), at the end of February and beginning of March 2017.[1] *Id.* With regard to financing, the Debtor submitted a letter from an entity which was only willing to offer an outline of potential financing, not a commitment. *Id.* Moreover, the suggested facility would barely cover the claims of BB&T and PDI. *See id.* The Debtor also submitted an email from a potential funder. *Id.* Both the letter and the email had been sent in the middle of March 2017. *Id.*

The Debtor's production was troubling because it confirmed that there were no potential buyers or lenders lined up to help the Debtor reorganize. It also confirmed that, for almost the

---

[1] Apparently, Sam Thevanayagam ("Mr. Thevanayagam"), the principal of Parts Life, met with one of the Debtor's principals, Dominic Durinzi ("Mr. Durinzi") a couple of times in February 2017. Tr. 78:15-25, 79:2-10. Despite subsequent attempts by Parts Life to follow up with the Debtor, it appears that the Debtor made little effort to initiate follow up with Parts Life. *See* Stip. Ex. A, at p. 33-37.

entirety of the exclusivity period, the Debtor had made virtually no effort to find a buyer or

funder, nor did it appreciate the urgency of doing so, despite its multiple assurances that it had

been making "significant efforts" to promote a sale of its business and obtain financing. *See* Mot.

to Extend ¶ 5. The Debtor's representation in its Motion to Extend that it had taken "timely

strides" to secure a buyer and post-petition financing clearly was overstated and disingenuous.

*See id.* at ¶ 8.

Given PDI's troubling allegations about the Debtor's administrative insolvency and tight

cash position, the Court entered an order on April 4, 2017 granting the Debtor a short extension

of the exclusivity period to April 24, 2017.[2] ECF 92. At the continued hearing on the Motion to

Extend on April 24, 2017, the Court entered another order granting the Debtor a final extension

of the exclusivity period to May 1, 2017 and encouraged PDI to have a plan ready to file on that

date. ECF 108.

On April 30, 2017, shortly after receiving a written offer from Parts Life to purchase the

Debtor's assets, the Debtor filed a plan of reorganization ("Debtor's Plan") incorporating Parts

Life's offer. App. ¶¶ 19-21; ECF 112. The Debtor's Plan, however, was patently unconfirmable

based upon, *inter alia*, (1) an unworkable two-step process whereby the sale of the Debtor's

assets to Parts Life would close before the government decided whether to approve the novation

of its contracts with the Debtor, requiring the parties to later unwind the closing if the novation

was not approved; and (2) a $2,700,000 financing contingency which, even if satisfied, would

have fallen far short of the additional $950,000 needed to close. Supp. St. ¶ 8.

---

[2] After the Court heard testimony, but before issuing a ruling, at the hearing on the Motion to Extend, PDI withdrew
the Trustee Motion based upon the Court's decision to closely monitor the Debtor's progress. Stip. ¶ 21; Tr. 36:10 –
37:7.

On May 1, 2017, after an evidentiary hearing on the continued Motion to Extend and based upon the significant shortcomings in the Debtor's Plan and the Debtor's troubling financial situation, the Court refused to further extend the exclusivity period. *See* App. ¶ 22. The same day, PDI filed a plan of reorganization ("PDI Plan") and disclosure statement.[3] ECF 116; App. ¶¶ 22, 23.

On May 19, 2017, PDI renewed its motion to appoint a chapter 11 trustee ("Trustee Motion") and sought the engagement of an independent chief restructuring officer (CRO) or, in the alternative, the appointment of a chapter 11 trustee based upon its concern that the Debtor had never had Parts Life sign a confidentiality agreement prior to disclosing proprietary information. ECF 125 Mot. to Appt. Trustee ¶¶ 6, 7, 9. Notably, PDI too had never signed a confidentiality agreement with the Debtor and understood that, if successful on the Trustee Motion, it would have to sign one. Stip. ¶ 30; Tr. 40:1-6. PDI was also concerned that the Debtor's refusal to consider the PDI Plan, which was confirmable unlike the Debtor's Plan, was hurting the Debtor's unsecured creditors. ECF 125 Mot. to Appt. Trustee ¶¶ 12-14. Recognizing that the Debtor could not afford to pay for a CRO given the Debtor's precarious financial position, PDI offered to pay the CRO's fees.[4] *Id.* at ¶ 18.

Shortly thereafter, on June 5, 2017, PDI filed a supplement to the Trustee Motion alleging that the Debtor had substantially exceeded the maximum permitted use of cash collateral and speculating that the Debtor may have received post-petition financing outside the ordinary course of business without court approval. ECF 133 Supp. Mot. to Appt. Trustee ¶¶ 1, 2. In

---

[3] As part of the process of drafting PDI's Plan, PDI's professionals had analyzed the tax consequences to PDI of proceeding with an asset versus stock acquisition of the Debtor. The parties stipulated that "Irwin Haber testified [at his deposition] that PDI's primary purpose in analyzing whether to proceed with an asset versus a stock acquisition was to determine which alternative gave PDI the best likelihood of acquiring DeVal." Stip. ¶ 28.

[4] PDI specifically represented that "[w]ere the Debtor to engage a CRO acceptable to PDI (such as any number of reputable recognized turnaround management consultants), PDI would fund the CRO's fees (up to $50,000 or potentially more)."

Case 16-17922-amc    Doc 254    Filed 11/15/18    Entered 11/15/18 13:26:38    Desc Main
Document    Page 8 of 23

response, the Debtor agreed to engage a CRO, which resolved the Trustee Motion by consent
and resulted in Parts Life and PDI signing confidentiality agreements. Stip. ¶ 30; App. ¶ 29; Obj.
to Mot. to Appt. Trustee 2.

Subsequently, PDI and the Debtor each amended their respective plans a few times. ECF
131, 135, 137, 146, 151. On June 16, 2017, PDI identified $60,000 as a minimum estimate of its
anticipated section 503(b) substantial contribution claim in an internal document captioned
"Sources and Uses of Cash for Parts Life-Deval as of June 16, 2017." Stip. ¶ 36; Tr. 64:10-15;
65:10-16; 68:6-19.

On June 19, 2017, the Court held disclosure statement hearings for the disclosure
statements associated with the Debtor's Second Amended Plan and PDI's Third Amended Plan
and approved both. ECF 155, 156. On July 28, 2017, PDI filed an objection to the Debtor's
Second Amended Plan. ECF 185. In an attempt to argue that the Debtor's Second Amended Plan
could not feasibly pay even minimum estimates of the case's administrative expenses, PDI
officially represented in its objection that its anticipated section 503(b) claim would amount to at
least $60,000. Obj. to Conf. of Debtor's Plan ¶ 8b; Tr. 67:1-22; 68:6-19.

PDI subsequently amended its plan twice and the Debtor amended its plan once. ECF
189, 193, 194. The final versions of both plans filed by PDI and the Debtor ultimately provided
for a 100% distribution to general unsecured creditors. App. ¶ 33; *See* ECF 193, 194. On August
7, 2017, after the confirmation hearings on the Debtor's Third Amended Plan and PDI's Fifth
Amended Plan, the Court confirmed the Debtor's Third Amended Plan and denied PDI's Fifth
Amended Plan. ECF 198, 199, 206.

On December 22, 2017, PDI filed the instant Application, initially requesting an administrative expense award in the amount of $181,435.98.[5] ECF 226. In the Application, PDI maintained that the Debtor had failed to take any meaningful action during the first four months of the case, despite PDI's consistent efforts to push the Debtor to effectuate a sale, which was the Debtor's only viable option to emerge from bankruptcy. App. ¶¶ 7, 8; Stipulation ¶ 18. Therefore, PDI argued that it had made a substantial contribution to the case by taking a more active role (with the expectation of reimbursement under section 503(b)), which directly contributed to the appointment of a CRO and confirmation of the Debtor's plan of reorganization, resulting in a 100% payout to unsecured creditors. App. 3-9.

On January 23, 2018, Parts Life filed its opposition to the Application ("Opposition") and the Debtor filed a Joinder to the Opposition.[6] ECF 232, 233. In the Opposition, Parts Life argued that PDI's actions in the bankruptcy proceeding were designed primarily to benefit itself and not the other creditors in the case. Opp. 1, 3, 5-6. The hearing on the Application was continued by agreement of the parties several times and was eventually set for August 1, 2018. ECF 234, 236, 237, 240.

On July 27, 2018, the parties filed a joint stipulation of facts ("Stipulation"). ECF 242. In the Stipulation, PDI stipulated that "PDI's primary purpose in the bankruptcy case from the very first day was to have the Debtor company sold through the bankruptcy process" in order to either acquire the company itself or to have its claim paid in full. Stip. ¶ 23. The Stipulation further provided that the Debtor had acknowledged that, at all times during the bankruptcy proceeding, its "only viable course of action was to sell its business as a going concern." *Id.* at ¶ 18.

---

[5] In its Application, PDI is not seeking reimbursement for fees paid directly to the CRO. Tr. 46:3 – 47:4.
[6] PDI agrees that Parts Life, as the party financially responsible for paying any administrative expense claims pursuant to the Debtor's Third Amended Plan, is the party in interest with standing to challenge the Application. Tr. 4:3-8.

Additionally, Parts Life stipulated that "the continued operation of Deval was a benefit to Deval's general unsecured creditors." *Id.* at ¶ 32.

The parties also stipulated that Mr. Haber had testified that, in acting to have an independent party appointed to oversee the Debtor's compliance with its fiduciary duties, PDI sought to ensure that the Debtor would operate with integrity, honesty and fairness. *Id.* at ¶ 22.

The Court conducted an evidentiary hearing on August 1, 2018 and heard testimony from the principals of PDI and Parts Life. During the hearing, Mr. Haber credibly testified that PDI's efforts to get "the debtor to the do the right thing and to affect a sale of the company on a timely basis" were primarily designed to benefit all creditors in the case. Tr. 61:9-62:1. He also testified that PDI was merely an observer during the first four months of the case and, after watching the Debtor fail to take any action to find a buyer or financer,

> felt at that point we had to do something. Nobody else was doing anything. We had to take action, otherwise the case would languish. And given their [Deval's] perilous cash position, given the company's fragile cash position, they could have fallen off the cliff at any time. That would have been bad for everybody.

*Id.* at 33:2-7.

At the conclusion of the hearing, the Court reviewed the key events that occurred during the bankruptcy case and made the following findings of fact:

At the outset of the case, there were six cash collateral hearings and, at each hearing, PDI voiced increasing concerns about the Debtor's failure to take any action to find a buyer despite the Debtor's acknowledgement that it would have to arrange a 363 Sale. *Id.* at 92:4-11. Mr. Haber credibly testified that PDI first became aware of the possibility of being awarded a substantial contribution claim under section 503(b) prior to filing the Objection and relied upon that possibility in deciding to object to extending the exclusivity period and seek the appointment of a trustee. *Id.* at 93:5-9.

Case 16-17922-amc    Doc 254    Filed 11/15/18    Entered 11/15/18 13:26:38    Desc Main
Document    Page 11 of 23

At the initial hearing on the Motion to Extend, the Court was shocked at the Debtor's lack of progress towards reorganization. *Id.* at 93:21 – 94:3. It became crystal clear that the Debtor had failed to take any meaningful action in the previous four months to seriously find a buyer. *Id.* at 94:3-5. Despite the interest in the Debtor shown by Parts Life, the Debtor did nothing of consequence to try to reach a deal. *Id.* at 94: 6-15. The Court, therefore, concluded that the Debtor had used the first four months of the case and the six cash collateral hearings to do no more than buy time, and sought to do the same through the Motion to Extend. *Id.* at 94:15-17. At that point, the Court shared PDI's concerns that the Debtor was on the verge of financial collapse given its tight cash position and that it would squander its only hope of salvaging its business the longer it continued to fail to find a buyer.[7] *Id.* at 94:20 – 95:11.

As a result of the pressure applied by PDI's Objection and the Court's short extension of the exclusivity period, the Debtor expedited its efforts to secure a commitment from Parts Life so that it could file a plan. *Id.* at 95:25 – 96:3. However, even after the Debtor finally proposed its Plan, the Debtor's Plan still fell woefully short of where it needed to be. *Id.* at 96:4-7. The Debtor only appeared to get back on track after PDI filed its own confirmable plan and, thereafter, the Trustee Motion. *Id.* at 96:4-8, 15-22. In direct response to the Objection, Trustee Motion and PDI's Plan, the Debtor finally began to take the reorganization process seriously, understanding that if it did not step up and arrange its own sale, a trustee or PDI would likely take control of the case. *Id.* at 95:21 – 96:3. With PDI breathing down its neck, the Debtor finally went into high gear with Parts Life to consummate a confirmable sale which ultimately resulted in a 100% payout to all the Debtor's creditors. *Id.* at 96:1-8; 98:16-21. PDI's actions in filing the Objection, the PDI Plan and the Trustee Motion, therefore, clearly provided a substantial benefit

---

[7] The Debtor's accounts payable, accrued expenses, and deferred revenues from progress payments exceeded its cash, accounts receivable, and work in progress by a multiple. Reply to Resp. ¶ 13.

11

to the Debtor's estate and not merely an incidental one because those actions finally prompted the Debtor to save itself. *Id.* at 96:9-22. In the absence of those actions taken by PDI, the Debtor would have likely run out of the time and money required to pursue a sale with Parts Life. *Id.* at 99:20 – 100:2.

Based upon the foregoing, the Court found that PDI's primary design in filing the Objection, the PDI Plan and the Trustee Motion was to prevent the Debtor's estate from ending up administratively insolvent. *Id.* at 96:15-22; 98:13-16. Thus, these three actions specifically were taken primarily to help all the Debtor's creditors, not just PDI.

Ultimately, the Court observed and concluded that, by causing the Debtor to forge a sale with Parts Life while it still had the opportunity to do so, the Objection, Trustee Motion and initial PDI Plan substantially contributed to the case in accordance with section 503(b)(3)(D). Therefore, the Court held that PDI was entitled to an award thereunder as well as to attorney fees and expenses under section 503(b)(4). *Id.* at 98:5 – 100:16. The Court determined that the award should cover reasonable legal fees and necessary expenses incurred in connection with the drafting, filing and hearings related to the Objection, the Trustee Motion and the initial PDI Plan dated May 1, 2017. *Id.* at 100:3-15.

On August 22, 2018, in preparation for a subsequent hearing on the specific amount of fees and expenses to be awarded, PDI submitted updated expense sheets and time records, requesting a total award of $105,150.97,[8] consisting of $10,379.96 in out of pocket expenses, $90,950.25 in counsel fees, and $3,820.76 in counsel's expenses. ECF 247 Supp. St. ¶ 5. On September 12, 2018, Parts Life filed its response, continuing to argue that PDI had not

---

[8] After a closer review of Third Circuit law, PDI reduced the original amount requested based on its position that the Third Circuit would not support reimbursing PDI for actions taken after it transitioned from a creditor to a genuine competing bidder. Tr. 8:3-15. However, PDI reserved its right to challenge the current Third Circuit law in the event this Court's decision is appealed. *Id.* at 8:7-9.

12

demonstrated that it had made a substantial contribution entitling it to an award pursuant to

section 503(b)(3)(D) or (b)(4). ECF 249 Resp. to Supp. St. 3-5. Alternatively, Parts Life objected

to certain time entries and the amount of fees and expenses requested on the basis that: (1) PDI

had requested fees exceeding the scope of the Court's ruling by requesting compensation for plan

preparation occurring after May 1, 2017 and services related to routine creditor activities; (2)

PDI should not recover fees incurred analyzing tax consequences of an asset or stock acquisition

of the Debtor because those services only advanced PDI's primary purpose of getting paid on its

claim; (3) PDI had presented no evidence that it had expected to recover more than $60,000; and

(4) incurring $105,000 in expenses and legal fees was unreasonable and excessive in light of the

services provided. *Id.* at 2-7.

In response to some of Parts Life's objections, PDI further reduced the requested counsel

fees by $14,644 before the September 26, 2018 hearing.[9] Reply to Resp. ¶ 6. Additionally, at the

hearing, PDI provided a more detailed statement of its out of pocket expenses and adjusted the

requested amount to $8,916.12, resulting in a request for a total administrative expense award of

$89,043.13. ECF 252 Ex. A. The Court also independently raised some concerns about the

reasonableness of certain airfare and transportation expenses incurred by PDI.

## III.    DISCUSSION

The Court will now, referencing applicable legal principles, elaborate on its holding that

PDI made a substantial contribution to the case and qualifies for an administrative expense claim

pursuant to section 503(b)(3)(D) and section 503(b)(4). The Court will then determine the actual

and necessary expenses incurred by PDI in making a substantial contribution under section

---

[9] PDI eliminated fees related to (1) routine analysis of cash collateral issues and (2) drafting amended plans and
objecting to disclosure statements after May 1, 2017. Reply to Resp. ¶¶ 4, 5.

503(b)(3)(D) and the reasonable expenses and fees attributable to its counsel's services under section 503(b)(4).

### A. Applicable Legal Principles Under 11 U.S.C. § 503(b)(3)(D) and § 503(b)(4)

Pursuant to section 503(b)(3)(D), the court shall allow the actual, necessary expenses incurred by a creditor in making a substantial contribution to a case under chapter 11 as an administrative expense. "Section 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging meaningful creditor participation in the reorganization process…and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for creditors." *Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 944 (3d Cir. 1994)) (internal citations omitted). Accordingly, courts must strictly construe section 503(b)(3)(D). *In re RS Legacy Corp.,* No. 15-10197(BLS), 2016 WL 1084400, at *3 (Bankr. D. Del. Mar. 17, 2016) ("As with all of the Bankruptcy Code's priority statutes, section 503(b)(3) is strictly construed to keep administrative expenses at a minimum.").

Under section 503(b)(4), the court shall also allow reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under section 503(b)(3)(D) as an administrative expense based on "the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title." Section 503(b)(4) further allows as an administrative expense reimbursement for actual, necessary expenses incurred by the attorney or accountant in rendering such professional services. Allowance of an award pursuant to section 503(b)(4) is contingent upon entitlement to a claim under section 503(b)(3)(D) and is only justified where the professional worked on behalf of an entity who actually made a substantial contribution in the case. *In re RS Legacy Corp.,* 2016 WL 1084400, at *3; *In re Phila. Newspapers, LLC,* 445 B.R.

14

450, 463 (Bankr. E.D. Pa. 2010); *In re Sound Radio, Inc.*, 145 B.R. 193, 208 (Bankr. D. N.J.

1993).

To establish entitlement to compensation or reimbursement of expenses pursuant to

sections 503(b)(3)(D) and 503(b)(4), the creditor-applicant bears the burden of proving by a

preponderance of the evidence that its services made a substantial contribution to the chapter 11

case.[10] *In re RS Legacy Corp.*, 2016 WL 1084400 at *3; *In re Worldwide Direct, Inc.*, 334 B.R.

112, 120 (Bankr. D. Del. 2005). To satisfy the Third Circuit test for determining whether an

applicant made a substantial contribution, the applicant must demonstrate that its efforts

conferred an actual and demonstrable benefit to the estate and other creditors.[11] *Lebron,* 27 F.3d

at 944; *In re Essential Therapeutics,* 308 B.R. 170, 174 (Bankr. D. Del. 2004). Services which

substantially contribute to a case are those which ultimately foster and enhance the progress of

reorganization. *Lebron,* 27 F.3d at 944; *In re Summit Metals, Inc.,* 379 B.R. 40, 50 (Bankr. D.

Del. 2007) ("The [applicant's] activities must facilitate progress in the case...").

Additionally, the applicant must show that its actions were designed to benefit others who

would foreseeably be interested in the estate. *Lebron,* 27 F.3d at 946; *In re Essential*

*Therapeutics,* 308 B.R. at 174. Courts may not allow as an administrative expense costs

associated with actions primarily designed to advance the applicant's own interests. *Lebron,* 27

F.3d at 944, 946. In fact, the Third Circuit has instructed that "substantial contribution should be

applied in a manner that excludes reimbursement in connection with activities of creditors...

designed primarily to serve their own interests and which, accordingly, would have been

undertaken absent an expectation of reimbursement from the estate." *Id.* at 944. "Creditors are

---

[10] *The Bankruptcy Code itself does not define "substantial contribution." In re Summit Metals, Inc., 379 B.R. 40, 50
(Bankr. D. Del. 2007).*
[11] *This necessarily requires the movant to establish a causal connection between its involvement and the contribution
to the debtor's case. In re RS Legacy Corp., 2016 WL 1084400 at *4; In re Worldwide Direct, Inc., 334 B.R. at 121.*

presumed to be acting in their own interests until they satisfy the court that their efforts have

transcended self-protection." *Id.* However, the Third Circuit recognizes that "[m]ost activities of

an interested party that contribute to the estate will also, of course, benefit that party to some

degree, and the existence of a self-interest cannot in and of itself preclude reimbursement." *Id.*

Routine creditor activities and services that are duplicative of other estate professionals

generally will not qualify for reimbursement under section 503(b)(3)(D) or (b)(4). *In re RS*

*Legacy Corp.*, 2016 WL 1084400, at \*4. To aide in determining whether a creditor has made a

substantial contribution, bankruptcy courts have considered numerous factors, including (1)

whether the services conferred a benefit upon the estate; (2) whether the services were provided

to benefit the estate generally or the creditor specifically; (3) whether the services were

duplicative of services rendered by other parties; and (4) whether the services would have been

provided absent an expectation of reimbursement. *In re Grasso,* 519 B.R. 137, 140 (Bankr. E.D.

Pa. 2014) (citing *In re Spansion Inc.,* 2014 WL 1928632, at \*2 (Bankr. D. Del. May 14, 2014)).

Significantly, a court may take into account its first-hand observance of the services provided

throughout the entire chapter 11 case in determining whether an applicant has demonstrated that

it made a substantial contribution to the case. *See In re Summit Metals, Inc.,* 379 B.R. at 61

(citing *In re 9085 E. Mineral Office Building, Ltd.,* 119 B.R. 246, 250 (Bankr. D. Col. 1990) as

support for the concept that a court's first-hand observance of the creditor's services may be a

sufficient basis for finding a creditor made a substantial contribution.).

### B. PDI Made a Substantial Contribution to the Debtor's Case by Filing the Objection, the Initial PDI Plan and the Trustee Motion

Keeping in mind the two purposes under section 503(b)(3)(D) of encouraging meaningful

creditor participation and minimizing fees and administrative expenses to preserve as much of

the estate as possible for creditors, the Court first further explains its basis for determining that

16

PDI made a substantial contribution in this case, entitling it to an administrative expense award.[12]
The Court concludes that PDI's efforts conferred an actual and demonstrable benefit to the
Debtor's creditors because PDI's Objection, Trustee Motion and initial PDI Plan pressured the
Debtor into finally taking action to consummate a sale of its assets, after months of inaction,
before it ran out of cash and collapsed. In the absence of these filings, the unsecured creditors
likely would have received nothing in this case. PDI's actions, therefore, contributed far more
than an incidental benefit to the estate; rather, PDI is responsible for saving the Debtor and
preserving the value of the Debtor at a critical juncture in the case.

     In addition, the Trustee Motion resulted in the actual benefit of the appointment of an
independent professional to help the Debtor act in accordance with its fiduciary duties in the face
of allegations of malfeasance and promote the estate's best interests. In general, the appointment
of a chapter 11 trustee is designed to foster and enhance the progress of a chapter 11 case. *In re
Glickman, Berkowitz, Levinson, & Weiner, P.C.,* 196 B.R. 291, 297 (Bankr. E.D. Pa. 1996); *In re
Paolino,* 71 B.R. 576, 580 (Bankr. E.D. Pa. 1987). Concerns which would lead to the
appointment of a trustee tend to resemble those which would lead to the appointment of a CRO.
In this case, following the appointment of the CRO, any alleged overuse of cash collateral
seemed to stop in response to the additional oversight. App. ¶ 29; Tr. 38:18-24.

     With regard to the creditor's primary purpose, the Third Circuit does not require that a
creditor seeking an award of administrative expenses enter a bankruptcy case with a wholly
altruistic motive in total disregard of its own claim. It simply requires that the particular *activities*
that the creditor seeks reimbursement for were primarily *designed* to benefit those foreseeably

---

[12] In addition to the testimony and other evidence presented at the August 1, 2018 evidentiary hearing and the
Stipulation, the Court relies upon its own observations of the parties throughout the chapter 11 case in making its
determination.

Case 16-17922-amc    Doc 254    Filed 11/15/18    Entered 11/15/18 13:26:38    Desc Main
Document    Page 18 of 23

interested in the estate. *Lebron*, 27 F.3d at 944-46. Here, the Court finds that PDI's efforts in filing the Objection, the initial PDI Plan and the Trustee Motion were primarily designed to accelerate the sale process in order to preserve the value of the Debtor's business as a going concern and prevent the estate from becoming administratively insolvent. Although PDI may have entered the case primarily motivated to protect its own claim in the case, the facts and circumstances surrounding these three filings demonstrate that PDI's actions transcended self-protection. PDI, therefore, has overcome the presumption of self-interest since these actions specifically were made for the benefit of all creditors in the case, not just PDI.

Furthermore, the actions taken by PDI were not entirely aligned with PDI's own interests. For instance, PDI took a huge risk in incurring significant costs, well above those it would have incurred as a regular observer of the case, in deciding to pursue a more aggressive course of action for the benefit of the estate. Although PDI hoped to be reimbursed from the estate, PDI had no guarantee that it would be awarded an administrative claim or that there would be sufficient funds in the estate to pay an administrative claim. Tr. 33:11 – 34:21. Additionally, engaging a CRO who would have no obligation to PDI involved a degree of risk that the CRO would not support PDI's Plan, would pursue higher bidders, or would leverage competing plans to essentially force PDI to pay more in order to have its plan confirmed. Most significantly of all, PDI's payment of all the CRO fees, without any expectation of repayment, corroborates PDI's genuine concern for protecting the value of the estate as a whole, clearly transcending self-promotion.

Additionally, PDI's efforts were not duplicative of any other professional's efforts. PDI was the only creditor that consistently showed up in this case and was solely responsible for

18

demonstrating to the Court that the Debtor had grossly exaggerated its sale efforts, which were critical to the Debtor's reorganization.

Finally, PDI was largely induced into taking more aggressive action in this case and filing the Objection, the initial PDI Plan and the Trustee Motion in reliance upon a potential award of an administrative claim under section 503(b). Tr. 34:7 – 36:6. Although PDI may not have expected compensation for its legal fees and expenses at the very outset of the bankruptcy case when it was simply performing routine creditor activities, the contemplation of section 503(b) reimbursement played a highly relevant role in its discussions with financial and legal advisors about the course of action it should take. *Id.* at 34:10-21; 35:14 – 36:6. The prospect of an administrative expense claim clearly materially influenced PDI to incur the additional expenses related to efforts to advance the case, such as objecting to an exclusivity extension, seeking to have a trustee appointed, and proposing its own plan.[13] *See id.* at 34:7 – 36:6 (representing that in March 2017, when PDI became aware of the opportunity to recover costs associated with a more aggressive approach to the case, that opportunity weighed heavily on PDI's decision of whether to undertake additional efforts to move the case along.).

Based upon the foregoing, PDI is entitled to recover the actual, necessary expenses that it incurred in connection with the Objection, the initial PDI Plan and the Trustee Motion as an administrative expense pursuant to section 503(b)(3)(D). Because the Court has allowed PDI's expenses under section 503(b)(3)(D), the Court will also allow reasonable compensation for professional services rendered by PDI's attorney in connection with the Objection, the initial PDI

---

[13] The Court does not give much weight to the fact that PDI's counsel lumped his time entries leading up to and after submitting the Objection, initial PDI Plan and Trustee Motion. Mr. Haber clearly testified that the prospect of reimbursement under section 503(b) was a material factor in PDI's decision to act aggressively and expensively to advance the case. Tr. 34:7 – 36:6. The form of counsel's timekeeping alone does not outweigh this credible, uncontroverted testimony.

Plan and the Trustee Motion, and reimbursement for related actual, necessary expenses, as an administrative expense pursuant to section 503(b)(4).

### C. Necessity of Expenses and Reasonableness of Fees Requested

After the court finds that a creditor has made a substantial contribution in accordance with sections 503(b)(3)(D) and 503(b)(4), it must then determine whether a creditor's expenses were actual and necessary, and whether the requested compensation for professional services rendered is reasonable. *See In re Summit Metals, Inc.,* 379 B.R. at 54. Compensable expenses pursuant to section 503(b)(3)(D) may include those for airfare, lodging, local transportation, and other actual and necessary expenses depending on the circumstances. *See In re Syntax-Brillian Corp.,* 2009 WL 1606474, at *3 (Bankr. D. Del. June 5, 2009).

Only those fees and expenses incurred performing activities related to the substantial contribution, however, are entitled to receive administrative expense status. *In re Essential Therapeutics,* 308 B.R. at 176; 4 *Collier on Bankruptcy* P 503.11[3] (16th Ed. 2018). Applicants may not recover fees and expenses for activities unrelated to the substantial contribution or designed primarily to protect their own interests, such as filing a proof of claim, staying informed about the case generally, preparing requests for notice, or reviewing pleadings. *In re Essential Therapeutics,* 308 B.R. at 175; *In re Burgoyne, Inc.,* No. 01-35687DWS, 2002 Bankr. LEXIS 1381, at *12 (Bankr. E.D. Pa. Nov. 4, 2002); *In re Washington Lane Assocs.,* 79 B.R. 241, 244 (Bankr. E.D. Pa. 1987).

The applicant bears the burden of establishing by a preponderance of the evidence that requested expenses were actual and necessary and that the counsel fees are reasonable. *In re Summit Metals, Inc.,* 379 B.R. at 54; *In re Worldwide Direct, Inc.,* 334 B.R. at 120. To meet this burden, applicants must detail each expense incurred for which reimbursement is sought, and

20

their attorneys must provide adequate time records. *In re Summit Metals, Inc.,* 379 B.R. at 54; *In re Burgoyne, Inc.,* 2002 Bankr. LEXIS 1381, at *n. 9. The Court must disallow entries which lack enough supporting detail to enable the Court to determine whether the requested fees and expenses were incurred while making a substantial contribution to the estate. *In re Summit Metals, Inc.,* 379 B.R. at 54-55; *In re Women First Healthcare,* 332 B.R. 115, 127 (Bankr. D. Del. 2005). However, if the court intends to reduce or disallow requested fees or expenses, it must give the applicant a reasonable opportunity to clarify ambiguities in the application or to present evidence or argument in support of the application. *See In re Murray,* 2007 WL 2317523, at *3 (Bankr. E.D. Pa. Aug. 6, 2007) (in the context of an application for compensation pursuant to 11 U.S.C. § 330).

To support its Application, PDI provided the time sheets of its counsel, which evidence the hours worked and rates claimed in connection with services which made a substantial contribution, as well as a spreadsheet detailing PDI's actual expenses, their purpose, the dates they were incurred, and the people who incurred them. *See* Reply to Resp. Ex. A; ECF 252 Ex. A. With regard to the counsel fees requested, the Court finds that efforts undertaken to understand the tax consequences to PDI of pursuing a stock versus an asset acquisition of the Debtor were primarily designed to serve PDI's interests and are not sufficiently related to the substantial contribution to justify compensation. Although such efforts may have constituted part of the plan development process, PDI specifically stipulated to the fact that "Irwin Haber testified that PDI's primary purpose in analyzing whether to proceed with an asset versus a stock acquisition was to determine which alternative gave PDI the best likelihood of acquiring Deval." Stip. ¶ 28. Counsel's time entries reflect that this analysis primarily focused on the tax implications of these potential arrangements. *See* Reply to Resp. Ex. A 6-7. Therefore, the